**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**PHIL BRYANT & DEBORAH BRYANT**                                    **PLAINTIFFS**

    **versus**                                    **CASE NO.** 3:24-cv-260-KHJ-MTP

**MICHAEL ROSENBERG &**
**THE ARENA GROUP HOLDINGS, INC.**                                    **DEFENDANTS**

---

**COMPLAINT**
**JURY TRIAL DEMANDED**

---

**NOW INTO COURT**, by and through undersigned counsel, come the Honorable Phil Bryant and former First Lady Deborah Bryant and bring this civil action against The Arena Group Holdings, Inc. and Michael Rosenberg for the following reasons:

**INTRODUCTION**

1.1     On May 18, 2023, Sports Illustrated ("SI") published an article written by SI senior writer Michael Rosenberg titled "'The Driving Force': How Brett Favre's Demands for Cash Fueled a Scandal" (the "Article"). SI published the article in print and electronic formats. The electronic format of the Article can be found at: https://www.si.com/nfl/2023/05/18/brett-favre-mississippi-welfare-scandal-driving-force-daily-cover. A true and correct copy of the Article is attached and incorporated as Exhibit 1.

1.2     In the Article, Rosenberg alleges a conspiracy involving former Governor Phil Bryant, former Mississippi Department of Human Services (MDHS) Executive Director John Davis, former Mississippi Community Education Center (MCEC) Director Nancy New, and NFL Hall of Fame quarterback Brett Favre. As per Rosenberg, the conspiracy aimed to defraud the State of Mississippi of tens of millions of welfare dollars to construct a volleyball facility at the

University of Southern Mississippi and invest in the pharmaceutical company Prevacus. Rosenberg claims Bryant orchestrated the scheme, and when its exposure seemed imminent, Bryant attempted to distance himself from it. The Article, in both isolated passages and as a whole, is false, defamatory, and constitutionally malicious.

1.3     The Article repackages similarly defamatory statements published by Deep South Today d/b/a Mississippi Today, its reporter Anna Wolfe, its editor-in-chief Adam Ganucheau, and its chief executive officer Mary Margaret White on various occasions during the past few years. The Bryants filed a civil action against Mississippi Today and these individuals in Madison County Circuit Court. The action is captioned *Phil Bryant & Deborah Bryant vs. Deep South Today d/b/a Mississippi Today, Mary Margaret White, Adam M. Ganucheau, Anna L. Wolfe & John Doe*, No. 23-cv-238-JM (Madison Co. Cir. Ct.). A true and correct copy of the Second Amended Complaint (without incorporated exhibits) in that action is attached and incorporated as Exhibit 2.

1.4     In the Article, Rosenberg writes, "Anyone can blame the media in a press release. It's not so easy under oath." This is true. It is also true that desperate media can recklessly publish defamatory and malicious lies to salvage the reputation of a once-great publication. Rosenberg and his former employer will discover the difficulty of defending these lies with persuasive evidence under penalty of perjury.

1.5     Former Governor Bryant demands special and general damages including, but not limited to, past and future income losses, impairment of reputation and standing in local, state, national, and business communities, personal humiliation, mental anguish, suffering, and emotional distress. Mrs. Bryant demands loss of consortium damages.

1.6     The Bryants also demand punitive damages, attorneys' fees, costs, and pre- and post-judgment interest from the defendants for maliciously, intentionally, and unlawfully

defaming or harming them. The Bryants also seek an injunction that compels Rosenberg and Arena to retract and correct all defamatory statements at issue in this suit.

## PARTIES

2.1    Phil Bryant is an adult resident of Copiah County, Mississippi. He was the 64th governor of the State of Mississippi and served two terms in office, spanning from 2012 to 2020.

2.2    Deborah Bryant is an adult resident of Copiah County, Mississippi. She is the wife of Phil Bryant and served as First Lady of the State of Mississippi during her husband's two terms as governor.

2.3    Defendant Michael Rosenberg was a senior writer for SI on all relevant occasions and, upon information and belief, is an adult resident of Michigan.

2.4    Defendant The Arena Group Holdings, Inc. ("Arena") f/k/a TheMaven, Inc. is a Delaware corporation that maintains its principal place of business in New York, New York.

## PRE-SUIT NOTICE

3.1    SI has experienced substantial turmoil during the past year. The following nonparties were involved in or impacted by these events:

a.   Nonparty Authentic Brands Group Inc. is a Delaware corporation with its principal place of business in New York, New York.

b.   Nonparty Authentic Brands Group LLC (referred to collectively with Authentic Brands Group Inc. as "Authentic Brands") is a Delaware limited liability company with its principal place of business in New York, New York.

c.   Nonparty ABG Intermediate Holdings 2 LLC ("ABG-IH2") is a Delaware limited liability company with its principal place of business in New York, New York. ABG-IH2 owns the intellectual property and other assets affiliated with SI. ABG-IH2's sole member is ABG

Intermediate Holdings 1 LLC ("ABG-IH1"), a Delaware limited liability company whose principal place of business is in New York, New York. ABG-IH2's sole member is Authentic Brands.

d.   Nonparty ABG-SI LLC ("ABG SI") is a Delaware limited liability company with its principal place of business in New York, New York. ABG-SI's sole member is ABG-IH2. In 2019, Arena[1] licensed certain content, intellectual property, trademarks, and other assets associated with the SI brand from ABG-SI ("Licensing Agreement").

3.2     Under the Licensing Agreement, Arena obtained a license granting it the right to manage and operate SI's print and digital media businesses, including SI's print and digital magazine, Sports Illustrated for Kids, the Sports Illustrated Swimsuit Issue, si.com, and other SI-branded websites. The Licensing Agreement allowed Arena to use SI's content, copyrights and trademarks, and digital channels in the United States and certain other territories and earn millions of dollars in payments from advertisers, subscribers, and other sources of revenue. In exchange, Arena promised to uphold SI's editorial and journalistic standards, to pay ABG-SI a yearly minimum payment of $15 million plus commissions and other royalties, and to issue warrants to ABG-SI to purchase shares of common stock of Arena.

3.3     On January 2, 2024, Arena failed to make a $3.75 million quarterly royalty payment, triggering ABG-SI's right to terminate the Licensing Agreement and collect a termination payment of $45 million.

3.4     On January 18, 2024, ABG-SI notified Arena that it was terminating the Licensing Agreement and demanded payment of $48.75 million.

---

[1] Arena was then known as TheMaven, Inc. ("TheMaven"). TheMaven's rebranding to Arena is immaterial to this action. Accordingly, the complaint refers to TheMaven and Arena interchangeably as "Arena."

3.5     The following day, Arena announced mass SI staff layoffs during a seven-minute Zoom call.

3.6     On March 18, 2024, ABG-SI announced that it had entered into a new licensing agreement with Minute Media LLC ("Minute Media").

3.7     Approximately two weeks later, Authentic Brands and its affiliates filed suit against Arena and its control person, Manoj Bhargava. See, *Authentic Brands Group, LLC, ABG-SI LLC, and ABG Intermediate Holdings 2 LLC vs. The Arena Group Holdings, Inc. and Manoj Bhargava*, No. 24-cv-2432-JGK (S.D. N.Y. Apr. 1, 2024) [Doc. 1].

3.8     Because of the uncertainty associated with identifying the publisher(s) of the Article and the corporate interests responsible for the liabilities arising from said publication(s), the Bryants provided written notice of their claims under Miss. Code Ann. § 95-1-5(1) to Rosenberg, Authentic Brands, ABG-IH1, ABG-IH2, ABG-SI, Arena, Minute Media, and various officers, control persons, and agents of these entities. True and correct copies of these notices are attached and incorporated as Exhibits 3 through 4.

3.9     Authentic Brands and its subsidiaries (collectively referred to as "ABG") responded to the Bryants' notice in a correspondence dated April 17, 2024. The correspondence explains that "ABG owns the SPORTS ILLUSTRATED brand but does not publish, produce, print, and/or distribute print or electronic editions of SPORTS ILLUSTRATED magazine; rather, it licenses such rights and, until recently granted such license to The Arena Group. The article that is subject to your client's Claim was written by and published by The Arena Group and The Arena Group is solely responsible for its content. ABG did not create or publish the article at issue, and we are not responsible for its content. A copy of the Claim has been forwarded to The Arena Group." A true and correct copy of this correspondence is attached as Exhibit 5.

3.10    Minute Media responded to the Bryants' notice in a correspondence dated April 21, 2024. Minute Media's attorney wrote, "ABG-SI, LLC owns the Sports Illustrated brand. Minute Media only recently licensed the rights to the Sports Illustrated brand from ABG-SI, LLC on March 17, 2024. To the best of Minute Media's knowledge, the Article was written and published by The Arena Group, a prior licensee of the Sports Illustrated brand, and so The Arena Group is solely responsible for the Article's content. Minute Media only licensed the right to use the Sports Illustrated brand a few weeks ago – long after the Article was published." A true and correct copy of this correspondence is attached as Exhibit 6.

3.11    The Bryants relied upon the representations in Exhibits 5 and 6 in crafting this pleading.

3.12    Rosenberg and Arena did not respond to the written notices that the Bryants served upon them under Miss. Code Ann. § 95-1-5(1).

## SERVICE OF PROCESS

4.1    Pursuant to Fed. R. Civ. P. 4(d)(1), Plaintiffs notified Defendant Michael Rosenberg that they had commenced a civil action against him and requested that he waive the service of a summons. If Rosenberg refuses to waive service, he may be served under Fed. R. Civ. P. 4(e).

4.2    Pursuant to Fed. R. Civ. P. 4(d)(1), Plaintiffs have notified Defendant Arena that they had commenced a civil action against it and requested that it waive the service of a summons. If it refuses to waive service, it may be served under Fed. R. Civ. P. 4(e).

## JURISDICTION, VENUE, & JURY TRIAL DEMAND

5.1    This action involves a controversy between parties of diverse citizenship and the amount in controversy exceeds $75,000. Accordingly, this court has subject matter jurisdiction under 28 U.S.C. § 1332(a).

5.2    A substantial part of the events or omissions giving rise to the claims in this civil action occurred in the Northern Division. Accordingly, this court is a proper venue under 28 U.S.C. § 1391(b)(2).

5.3    Plaintiffs demand a trial by jury for all claims so triable.

## FACTUAL BACKGROUND

### I. Bryant did not instruct anyone to fund the USM volleyball facility's construction with TANF funds or to invest TANF funds in Prevacus.

6.1    The Article is replete with false and defamatory statements. On page one, Rosenberg commenced the Article with the following passage:

> Three years ago, the State of Mississippi arrested a 67-year-old grandmother with no known criminal record at her office.

> Nancy New was a lifelong educator. She had run her nonprofit, Mississippi Community Education Center, for over 25 years. When state auditor Shad White's agents interrogated New multiple times, she didn't even bring an attorney, according to a person with direct knowledge of the meetings. At the end of one of those interviews, one of New's alleged accomplices, 63-year-old accountant Anne McGrew, expressed surprise that the auditor's agents had guns, the person says. The agents explained that while they worked for the auditor's office, they were not auditors. They were state police.

> At that time, they were focused on the state's welfare-agency director, John Davis, and two former professional wrestling brothers he allegedly enriched. But the misspending of welfare funds went far beyond that. Investigators kept peeling back layers of the scheme until they arrested New and a handful of others, at which point White declared, "The scheme is massive. It ends today."

> Only a few weeks later – after investigators stumbled upon more information, more was leaked publicly and the story exploded – did a more full picture come into focus:

> New was mostly following orders from Davis, the welfare chief.

Davis largely operated on behalf of Mississippi's then-governor, Republican Phil Bryant.

And Bryant worked relentlessly to please the state's most famous athlete, NFL legend Brett Favre.

6.2     The Article addresses two subjects: (1) the use of Temporary Assistance for Needy Families (TANF) funds to construct a volleyball facility on the University of Southern Mississippi (USM) campus and (2) the investment of TANF funds in the pharmaceutical company Prevacus.

6.3     Bryant did not instruct anyone to use TANF funds to construct the USM volleyball facility.

6.4     Bryant did not instruct anyone to invest TANF funds in Prevacus.

6.5     The quoted statement is false and defamatory.

**II. Bryant did not engage in illegal behavior, did not plot with or against anyone, and did not outmaneuver anyone.**

6.6     On page two, the Article continues:

Favre was a leading character in a drama full of political alliances and personal favors; of celebrities and their sycophants; of unchecked power and unconscionable use of federal [TANF] funds. Illegal behavior was so institutionalized that some perpetrators showed no fear of getting caught. One of Favre's business partners referred to Bryant as part of his "team," to which the governor replied, in part: "We will get this done," according to texts *Sports Illustrated* obtained over the course of several months of reporting. The governor texted Favre about "our cause."

When it unraveled – starting with an accidental, seemingly innocuous discovery – the most powerful players started outmaneuvering the others. Eventually, people who plotted with one another plotted against one another – a theme that continues to play out in both ongoing civil and criminal cases.

6.7     Bryant did not engage in "illegal behavior;" he did not "outmaneuver [] the others;" he did not plot with Davis, New, Favre, or anyone else to violate the law; and he did not plot against Davis, New, Favre, or anyone else regarding illegal behavior. The Article's statements to the contrary are false and defamatory.

6.8     Bryant is not a defendant in the civil action brought by the Mississippi Department of Human Services to recoup misspent welfare funds; he is not a defendant in any criminal action; he has not been notified that he is a target of any investigation; and no civil or criminal case involves the "theme" that Bryant plotted with or against anyone. The Article's statement to the contrary is false and defamatory.

**III. Bryant did not engage in a scheme to misspend public funds in constructing the USM volleyball facility.**

6.9     At the bottom of page two and carrying through page three, the Article reads:

On April 20, 2017, Favre sent his first text message to another prominent Southern Miss alum:

"Hey governor this brett Favre."

He got to the point quickly: "Deanna [his wife] and I are building a volleyball facility on campus and I need your influence somehow to get donations and or sponsorships. Obviously Southern has no money so I'm hustling to get it raised."

Bryant, who was returning from a trip to Cuba, wrote back:

"Of course I am all in on the Volleyball facility. Y'all have fun and next week come see me. We will have that thing built before you know it one thing I know how to do is raise money."

Bryant finished with the thumbs-up emoji. He said he was going on a turkey-hunting trip soon but would meet Favre for lunch when he returned.

From there, the scheme developed with startling efficiency.

6.10     Bryant did not engage in a "scheme" to misspend public funds in constructing the USM volleyball facility. The Article implies otherwise and, accordingly, it is false and defamatory.

**IV. Bryant did not have advanced or contemporaneous knowledge of and did not approve Davis's commitment of $4 million of TANF funds to construct the USM volleyball center. The defendants' publication of Burnett's baseless speculation is defamatory.**

6.11     On page four, addressing a meeting in which Davis purportedly offered $4 million of TANF funds for the construction of the USM volleyball facility, the Article reads:

It was as though Davis knew he would deliver the money before the meeting.

Bryant's lawyers would later say he had "no knowledge of or involvement in" the meeting or the $4 million commitment. But Mississippi Low-Income Child Care Initiative founder Carol Burnett, who worked in MDHS in the early 2000s, tells SI, "The head of DHS doesn't make those decisions without the governor's knowledge and approval. That is just unfathomable to me."

6.12    Bryant did not have advanced or contemporaneous knowledge of Davis's commitment and did not approve of it. The defendants' publication and endorsement of Carol Burnett's baseless speculation are defamatory.

**V. Bryant did not perform or provide "a large, legally dubious" favor for Favre.**

6.13    On page seven, the Article reads, "Those were legal favors. But Favre would soon push Bryant for a large, legally dubious one – and he didn't have to push very hard."

6.14    The Article explains that Bryant, Favre, Prevacus CEO Jake Vanlandingham, and "New Orleans businessperson Joseph Canizaro, a longtime donor to Mississippi Republicans," attended a dinner to discuss Prevacus. The Article notes that, before the dinner, Vanlandingham texted Bryant: "We want you to know that we want you on the team and can offer stock."

6.15    Thereafter, the Article explains that "Nancy New and MCEC agreed to send $1.7 million in TANF money to Prevacus" and ultimately sent "around $2.2 million in welfare money to Prevacus and another Vanlandingham company, PresolMD, according to various filings."

6.16    In summary fashion, the Article concludes, "Vanlandingham and Favre had their cash infusion; Bryant's ally, Canizaro, had the inside track on a real estate deal; and Bryant had Vanlandingham dangling company stock for him."

6.17    Bryant helped arrange and attended a dinner, during which Vanlandingham delivered a pitch for Prevacus. He did not perform or provide "a large, legally dubious" favor for

Favre or anyone else, and he did not agree to accept stock in Prevacus. The Article's statement that Bryant provided "a large, legally dubious" favor for Favre is false and defamatory.

### VI. Bryant did not participate in a "volleyball scheme."

6.18     On page ten, regarding Jacob Black reporting information to the governor's office, the Article states:

> The volleyball scheme was almost complete. But there was about to be a break in the Bryant-to-Davis-to-New-to-Favre chain. During a routine internal MDHS audit, an auditor noticed that one of Brett DiBiase's MDHS paychecks went to a post office box belonging to John Davis, people familiar with the case said. That was not normal, and Davis's relationship with the DiBiases had already raised suspicions. The internal auditor reported it. Then DHS deputy director Jacob Black turned Davis into the man who was best positioned to end the corruption: Governor Phil Bryant. Bryant had no choice. Ignoring this would be an obvious crime – with witnesses. Bryant alerted the state auditor, Shad White – who was Bryant's former campaign manager and a Bryant appointee. But the governor appears not to have told White about the volleyball facility or Prevacus – which, of course, would have implicated himself.

6.19     Bryant did not participate in a volleyball scheme, there was no Bryant-to-Davis-to-New-to-Favre chain, and he did not engage in any criminal activity. Bryant would not have implicated himself in criminal activity or actions giving rise to civil liability had he told White about the volleyball facility or Prevacus. The quoted statements are false and defamatory.

### VII. Bryant did not scheme to do anything illegal or unethical.

6.20     On page 11, the Article states, "With Davis out, the scheme was down to three principals: Phil Bryant, the veteran pol. Brett Favre, the relentless competitor. Nancy New, the naïve pleaser."

6.21     Bryant did not participate in a scheme to do anything illegal or unethical with Favre, New, or anyone else. The statement is false and defamatory.

6.22     Moreover, Nancy New was undoubtedly not a "naïve pleaser." She is a disgraced felon who stole millions of dollars from the State of Mississippi.

6.23    On April 20, 2022, New pleaded guilty in federal court to "a violation of Title 18, United States Code, Section 1957 for Monetary Transactions with the Proceeds of a Specified Unlawful Activity, that is, wire fraud."[2] Two days later, New pleaded guilty in state court to four counts of bribery of a public official, two counts of fraud against the government, six counts of wire fraud, and a RICO count.[3] The list of New's admitted criminal activities is staggering:

**Count 11 – Bribery of a Public Official**

On or about March 23, 2017, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting, assisting, or encouraging Nancy New, John Davis and others, did wrongfully agree to give John Davis, Executive Director of Mississippi Department of Human Services, and two of his senior executives, at their request, and for their own personal use, personal property, to wit: an "off the books" black GMC Yukon SUV, which was not procured through the normal channels at MDHS, but which was paid for, in whole or in part, using limited purpose grant funds, said transaction being an inducement or incentive for John Davis and these MDHS executives for awarding grant funds to Mississippi Community Education Center in violation of Miss. Code Ann. 97-11-53.

**Count 12 – Bribery of a Public Official**

On or about September 1, 2017, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting, assisting, or encouraging Nancy New and John Davis, Director of the Mississippi Department of Human Services, did hire Brett DiBiase, the then Director of Transformational Change at Mississippi Department of Human Services, and pay DiBiase an annual salary of $250,000.00, and a "travel allowance" for the purpose of traveling with John Davis, despite knowing that Brett DiBiase was unqualified to perform the services for which he was hired, and despite knowing that this use of public limited purpose funds was a violation of the terms and conditions of the grants. Brett DiBiase was hired and paid a "travel allowance" to travel with John Davis as an inducement or incentive to John Davis for awarding grant funds to Mississippi Community Education Center in violation of Miss. Code Ann. 97-11-53.

**Count 13 – Bribery of a Public Official**

On or about and between February 2019 and June 2019, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting, or encouraging John Davis and others, and at the request of John Davis, Director of the Mississippi Department of Human

---

[2] *United States v. Nancy W. New*, 3:21-cr-28-CWR-FKB (S.D. Miss. Apr. 20, 2022), *Plea Agreement* [Doc. #48].

[3] *State of Mississippi v. Nancy New*, No. 22-2-002 (Hinds Cty. Cir. Ct. Apr.22, 2022), *Petition to Enter a Plea of Guilty* [MEC Doc. #6].

Services, did wrongfully provide or allow to be provided to John Davis unrestricted access to, and use of, Mississippi Community Education Center's American Express Card, which was paid, in whole or in part, using limited purpose grant funds, and which John Davis used to charge, or caused to be charged, first class airfare and luxury hotel accommodations for himself and Brett DiBiase, an inducement or incentive for awarding grant funds to Mississippi Community Education Center in violation of Miss. Code Ann. 97-11-53.

**Count 14 – Bribery of a Public Official**

In 2017, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting, assisting, or encouraging Nancy New and John Davis, Director of the Mississippi Department of Human Services, did knowingly hire Austin Smith, John Davis' nephew, using, in whole or in part, limited purpose grant funds, despite knowing that Austin Smith was unqualified to perform the services for which he was hired, and despite knowing that use of public limited purpose funds in this manner was a violation of the terms and conditions of the limited use grants. Austin Smith was hired as an inducement or incentive to John Davis for awarding grant funds to Mississippi Community Education Center in violation of Miss. Code Ann. 97-11-53.

**Count 27 – Fraud Against the Government**

In or around August 2018, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting, assisting, or encouraging Nancy New, John Davis and others, and at the direction of John Davis and others, participated in a scheme to defraud the State of Mississippi by knowingly transferring or causing to be transferred $1,200,000.00 in limited use grant funds to Victory Sports Foundation, a company known by Zachary New, John Davis and others to be ineligible to receive such grant funds for the purposes for which they were provided, in violation of Miss. Code Ann. 97-7-10.

**Count 28 – Fraud Against the Government**

On or about September, 2018, Nancy New, while acting in concert with and/or aiding, abetting, assisting or encouraging John Davis and others known and unknown to the Grand Jury, and at the direction of John Davis did knowingly pay $365,000.00 for a Virtual Reality program using, in whole or in part, limited purpose grants, despite knowing that the expenditures was an ineligible use of grant funds for the purpose for which they were provided, in violation of Miss. Code Ann. 97-1-10.

**Count 33 – Wire Fraud**

On or about April 8, 2019, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting, and assisting Nancy New, John Davis and others, and at their direction, participated in a scheme to defraud the State of Mississippi by transmitting or causing to be transmitted $500,000.00 in limited purpose grant funds from a bank account owned by Mississippi Community Education Center to a bank account owned by New Learning Resources Inc. and then across county and state jurisdictional lines to a bank

account owned by Prevacus, Inc., a company in Florida known to be ineligible to receive such public grant funds, for purposes not allowed pursuant to the limited purpose grants from which the funds originated, in violation of Miss. Code Ann. 97-19-83.

**Count 34 – Wire Fraud**

On or about May 10, 2019, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting and assisting Nancy New, John Davis and others, and at their direction, participated in a scheme to defraud the State of Mississippi by transmitting or causing to be transmitted $250,000.00 in limited purpose grant funds from a bank account owned by Mississippi Community Education Center to a bank account owned by New Learning Resources Inc. and then across county and state jurisdictional lines to a bank account owned by Prevacus, Inc., a company in Florida known to be ineligible to receive such public grant funds, for purposes not allowed pursuant to the limited purpose grants from which the funds originated, in violation of Miss. Code Ann. 97-19-83.

**Count 35 – Wire Fraud**

On or about July 16, 2019, Zachary New and Nancy New, while acting in concert with and/or aiding, abetting and assisting Nancy New, John Davis and others, and at their direction, participated in a scheme to defraud the State of Mississippi by transmitting or causing to be transmitted $400,000.00 in limited purpose grant funds from a bank account owned by Mississippi Community Education Center to a bank account owned by New Learning Resources Inc. and then across county and state jurisdictional lines to a bank account owned by Prevacus, Inc., a company in Florida known to be ineligible to receive such public grant funds, for purposes not allowed pursuant to the limited purpose grants from which the funds originated, in violation of Miss. Code Ann. 97-19-83.

**Count 36 – Wire Fraud**

On or about September [sic] July 2018, Nancy New, while acting in concert with and/or aiding, abetting, assisting or encouraging John Davis and others known and unknown to the Grand Jury, at the request of John Davis, Director of the Mississippi Department of Human Services, did knowingly pay Jessee Pearce the costs of a lease for the purpose of providing a venue for his personal training business by using, in whole or in part, limited purpose grant funds, despite knowing that the expenditure was an ineligible use of grant funds for the purposes for which they were provided, [in] violation of Miss. Code Ann. 97-7-10.

**Count 37 – Wire Fraud**

On or about March 2019, Nancy New, while acting in concert with, and/or aiding, abetting, assisting or encouraging John Davis and others known and unknown to the Grand Jury, at the direction of John Davis, Director of the Mississippi Department of Human Services, did knowingly provide Three Thousand ($3,000.00) cash to John Davis, at the direction of John Davis, to be used by the said John Davis as an incentive to participants of a

promotional seminar to enroll in a program known as Law of 16, by using, in whole or in part, limited purpose grant funds, despite knowing that the expenditure was an ineligible use of grant funds for the purpose for which they were provided, in violation of Miss. Code Ann. 97-7-10.

**Count 38 – Wire Fraud**

On or about June 4, 2019, Nancy New, while acting in concert with, and/or aiding, abetting, assisting or encouraging John Davis and others known and unknown to the Grand Jury, at the direction of John Davis, Executive Director of the Mississippi Department of Human Services, did knowingly provide approximately Forty Thousand ($40,000.00) Dollars to be used for the purchase of children's books from another to be given away, despite knowing that the expenditure was an ineligible use of grant funds for the purposes for which they were provided, in violation of Miss. Code Ann. 97-7-10.

**Count 45 – RICO**

On or about and between September 1, 2018, and February 4, 2020, Nancy New, while acting in concert with and/or aiding and abetting and assisting John Davis and others known and unknown to the Grand Jury, did conduct, organize, supervise or manage, directly or indirectly, an association of two (2) or more persons who engaged in the conduct of were associated for the purpose of effectuating the transfer or sale of services or information acting as a subgrantee for TANF funds granted to the State of Mississippi and its Department of Human Services that had a pecuniary value that causes a loss to a victim, being the State of Mississippi and its Department of Human Services, and which conduct, organization, supervision, or management involved the fraud enterprise in repeated violations of MS Code 97-19-83, by transmitting money obtained by criminal fraud and forgery across state lines to RISE MALIBU in California on numerous occasions in violation of MS Code 97-43.3.1.

6.24     It is apparent that in crafting the Article, Rosenberg relied on information provided to him by Nancy New or individuals aligned with her and disregarded a mountain of objective evidence proving Bryant did not direct TANF funding to the USM volleyball facility project or Prevacus.

6.25     Rosenberg opted to believe a disgraced felon with an axe to grind and uncorroborated stories to tell and ignored the integrity and conclusions of every state and federal investigator who has reviewed the case. There is no competent evidence that Governor Bryant did anything corrupt or illegal. Rosenberg's claim to the contrary is false, defamatory, and malicious.

**VIII. Bryant did not conspire to do anything illegal or unethical with Favre.**

6.26    Also, on page 11, the Article states, "Bryant should have seen it was time to end this. But the governor just wouldn't quit Brett Favre."

6.27    There was nothing to end and nothing for Bryant to quit. The statement implies that Bryant conspired with Favre to defraud the state of public funds, which is false and defamatory.

**IX. Bryant did not make it "seem" like he was "vaguely aware of the volleyball project;" he was vaguely aware of it.**

6.28    On page 12, regarding a text that Bryant sent to staff attorney Whitney Lipscomb, the Article states, "Bryant tapped his old friend Chris Freeze, a retired FBI agent, to replace Davis. Almost immediately, Bryant sent a staff attorney a text that made him seem only vaguely aware of the volleyball project: 'Can we check with Nancy New and what the contract with Southern Miss is all about. Brett is asking for info on the proposed funding.'"

6.29    Freeze and Bryant were not old friends, and Bryant did not send a text that made "him seem only vaguely aware of the volleyball project." Bryant was vaguely aware of the volleyball project. Bryant was not involved with planning the project, crafting the associated lease arrangement, or approving or directing funding for the project. This statement is false and defamatory.

**X. Bryant did not know about and was not involved in directing TANF funds to the USM volleyball facility project.**

6.30    On page 13, regarding a text in which Bryant wrote that he was "not sure who made the deal for a million dollars," the Article states, "Favre and New finally took note of Bryant's sudden change from openly enthusiastic to detached and cautious."

6.31    Bryant did not suddenly change from openly enthusiastic to detached and cautious. Bryant was not involved with planning the project, crafting the associated lease arrangement, or approving or directing funding for the project. The statement is false and defamatory.

**XI. Bryant did not direct Favre in crafting a proposal that MDHS would approve.**

6.32    On page 14, regarding the drafts of New's proposal that Favre sent to Bryant, the Article states, "Bryant, who was in Ghana, was still cautious with his texts. But on the phone with Favre, Bryant was more candid – and Favre then texted New what Bryant had said, inadvertently creating a record of it. So Bryant told Favre via text that he hadn't seen the proposal: 'Nancy has to provide the proper documentation to MDHS.' Then Bryant talked to Favre on the phone. And then Favre texted New: 'He said to me just a second ago that he has seen it but hint hint that you need to reword it to get it accepted.'"

6.33    Bryant was not more candid with Favre on the phone; he did not speak with Favre. The quoted statement implies that Bryant directed Favre during a telephone discussion to craft a funding proposal that MDHS would approve. Bryant did not direct MDHS to fund projects or instruct Favre on crafting a proposal that MDHS would approve. The statement is false and defamatory.

**XII. Bryant never promised Favre or anyone else that MDHS would fund the construction of the USM volleyball facility.**

6.34    On page 15, regarding texts between Bryant and Freeze addressing the volleyball center, the Article states, "Bryant portrayed himself as forthright and proper: 'As always I am not going to interfere.' … as being too busy to monitor MDHS funding: 'You got a better understanding than I do of these projects.' … and as out of the loop for years: 'I think Brett was told it was going to get done by the previous Director. One of the reasons that he is a former Director.' Bryant apparently wanted Freeze – or whoever might be reading his texts – to believe

he had fired Davis, at least in part, for promising to fund the volleyball facilities. But Bryant had repeatedly made the same assurance to Favre for years – and he kept doing it."

6.35    Bryant did not "portray" himself as forthright and proper, too busy to monitor MDHS funding, and out of the loop for years. Bryant was honest and proper; he was not involved with the USM volleyball facility's funding; and he was out of the loop regarding the facility's funding. Bryant never assured Favre that he would direct MDHS or TANF funds toward the construction of the volleyball facility. The statement is false and defamatory.

### XIII. Bryant did not "set" a "trap" in the "volleyball scheme."

6.36    On page 16, the Article states, "The trap had been set. If the volleyball scheme were to blow up – which it would, a few months later – Bryant had made it look like New was the perpetrator, Favre the accomplice and Bryant the honest occasional advisor. But first Bryant kept telling Favre he would try to get him his money."

6.37    Bryant did not set a trap; he did not make it look like New was the perpetrator; he did not make it look like Favre was an accomplice; and he did not make it look like he was the honest occasional advisor. The statement is false and defamatory.

### XIV. Bryant did not "sell out" Favre.

6.38    On page 17, the Article states, "On Feb. 2, Favre stood on the field before the Super Bowl wearing a maroon sport coat, enjoying another compliment in a life overflowing with them. The NFL had named him one of the 100 best players of its first century. As he waved to fans alongside other legends in South Florida, Favre apparently did not realize that back in Mississippi, Phil Bryant was selling him out."

6.39    Bryant did not sell Favre out. The statement is false and defamatory.

**XV. Bryant did not tell White that Davis was funneling government money to the DiBiases; no trail leads to Bryant; and law enforcement did not find "explosive texts implicating Bryant and Favre that eventually became public."**

6.40    On page 18, the Article states, "Shad White would say publicly he was alerted to the fraud by a whistleblower: Former Mississippi Governor Phil Bryant. After all, Bryant had told White that John Davis was funneling government money to the DiBiases, triggering the inquiry. White almost certainly did not know the trail would lead to Bryant. But during the course of the investigation, law enforcement found explosive texts implicating Bryant and Favre that eventually became public."

6.41    Bryant did not tell White that Davis was funneling government money to the DiBiases; no trail leads to Bryant; and law enforcement did not find "explosive texts implicating Bryant and Favre that eventually became public." There is a reason why Bryant is not a party to any criminal or civil case arising out of the MDHS fraud. He did nothing illegal. These statements are false and defamatory.

**XVI. Bryant did not indicate he would accept Prevacus stock.**

6.42    On page 19, the Article states, "Though the former governor indicated he would accept Prevacus stock, he either ran out of time or suddenly changed his mind before the arrests."

6.43    Bryant never indicated he would accept Prevacus stock. He did not run out of time to do so and did not suddenly change his mind.

6.44    This statement is false and defamatory.

**XVII. Bryant's attorneys have never said, "Bryant didn't know the money Favre wanted came from TANF because Favre never mentioned it."**

6.45    On page 20, the Article states, "Bryant's lawyers have argued in a court filing that New and Davis embezzled MDHS funds 'unbeknownst to Bryant.' They have said Bryant didn't know the money Favre wanted came from TANF because Favre never mentioned it."

6.46    The undersigned did not state in any court filing that "Bryant didn't know the money Favre wanted came from TANF because Favre never mentioned it." This statement is false and contributes to the Article's defamatory message: Bryant was part of a criminal scheme to divert TANF funds to construct the USM volleyball facility and invest in Prevacus.

## CAUSES OF ACTION

### COUNT NO. 1: DEFAMATION (by former Gov. Bryant vs. both defendants)

7.1    Plaintiff Phil Bryant adopts all preceding and following allegations into this count by reference.

7.2    The elements of a defamation claim brought by a public figure are (1) a false and defamatory statement concerning the plaintiff, (2) unprivileged publication by the defendant to a third party, (3) fault amounting to actual malice of the defendant, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

7.3    The preceding statements satisfy the elements of a defamation claim because:

a.   The statements are false and defamatory;

b.   the statements are unprivileged publications by the defendants;

c.   the defendants knew the statements were false when they made them, or they made the statements with reckless disregard for their truthfulness and the harm they would cause former Governor Bryant; and

d.   the statements are libelous per se, and therefore, special harm is presumed.

7.4    The defendants' false and libelous accusations caused Bryant to sustain compensatory damages, including special and general damages.

**COUNT NO. 2: FALSE LIGHT (by former Gov. Bryant vs. both defendants)**

8.1     Plaintiff Phil Bryant adopts all preceding and following allegations into this count by reference.

8.2     The elements of a false light invasion of privacy claim are (1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the actor had knowledge of or acted in reckless disregard of the falsity of the publicized matter and the false light in which the other would be placed.

8.3     The preceding statements placed former Governor Bryant in a false light that would be highly offensive to a reasonable person, and the defendants knew or acted in reckless disregard of the falsity of the publicized matters and the false light in which former Governor Bryant would be placed.

8.4     The defendants' false accusations caused Bryant to sustain compensatory damages, including special and general damages.

**COUNT NO. 3: LOSS OF CONSORTIUM (by Mrs. Bryant vs. both defendants)**

9.1     Plaintiff Deborah Bryant adopts all preceding and foregoing allegations into this count by reference.

9.2     A loss of consortium claim is personal to the wife of an injured husband and arises out of the marriage relation. She is entitled to society, companionship, love, affection, aid, services, support, sexual relations, and the comfort of her husband, which are special rights and duties growing out of the marriage covenant. These may be added to the right to live together in the same house, eat at the same table, and participate in the activities, duties, and responsibilities necessary to make a home. All of these are included in the broad term "conjugal rights." Consortium does

not consist alone of intangible mental and emotional elements but may also include services performed by the husband for the wife, which have a monetary value.

9.3    The defendants have caused Deborah Bryant to suffer recoverable losses of consortium. Mrs. Bryant seeks to recover monetary damages for these losses in this action.

**COUNT NO. 4: RESPONDEAT SUPERIOR (by both plaintiffs vs. both defendants)**

10.1    Plaintiffs adopt all preceding and foregoing allegations into this count by reference.

10.2    Rosenberg made false and defamatory accusations while acting within the course and scope of his employment with Arena.

10.3    Rosenberg had actual or apparent authority to make his false and defamatory accusations.

10.4    Arena is vicariously liable for the damage caused by Rosenberg's false and defamatory accusations under the common law doctrine of respondeat superior.

10.5    The common law doctrine of respondeat superior renders Rosenberg and Arena jointly and severally liable for any judgment returned against Rosenberg.

**COUNT NO. 5: INJUNCTIVE RELIEF (by both plaintiffs vs. both defendants)**

11.1    Plaintiffs adopt all preceding and foregoing allegations into this count by reference.

11.2    The Restatement (Second) of Torts provides that "[w]hen it has been formally determined by a court that a statement is both defamatory and untrue and the defendant persists in continuing to publish it, a carefully worded injunction might meet the need and be available against further publication of the statement that has already been determined by the court to be false and defamatory." Restatement (Second) of Torts § 623, *Special Note on Remedies for Defamation Other Than Damages*, 329 (1977). Numerous courts have recognized the viability of injunctive

relief in these circumstances. Defamation: A Lawyer's Guide § 9:9, *Injunctive Relief* (Oct. 2023 Update) (collecting cases).

11.3    After the court determines the statements at issue are false and defamatory, this court should issue an injunction that (1) compels the defendants to request the removal of all previously issued false and defamatory statements from SI's website, social media accounts and elsewhere and (2) prevents the defendants from publishing any further statements similar to those found to be false and defamatory.

## **AD DAMNUM**

12.1    Plaintiffs adopt the complete content of all preceding and following paragraphs into their ad damnum clause by reference.

12.2    While the businesses that former Governor Bryant is associated with have increased revenue and profitability year-over-year, the false and defamatory remarks outlined in this pleading have caused Bryant to lose the following income:

a.   The defamation caused Bryant to lose approximately $8,000.00 in annual income from Client 1.

b.   The defamation caused Bryant to lose approximately $83,332.00 in annual income from Client 2.

c.   The defamation caused Bryant to lose approximately $132,000.00 in annual income from Client 3.

d.   The defamation caused Bryant to lose approximately $96,000.00 in annual income from Client 4.

e.   The defamation caused Bryant to lose approximately $90,000.00 in annual income from Client 5.

f.  The defamation caused Bryant to lose approximately $12,000.00 in annual income from Client 6.

g.  The defamation caused Bryant to lose approximately $8,000.00 in annual income from Client 7.

h.  The defamation caused Bryant to lose approximately $44,000.00 in annual income from Client 8.

i.  The defamation caused Bryant to lose approximately $8,000.00 in annual income from Client 9.

12.3    The false and defamatory accusations outlined in this pleading caused former Governor Bryant to lose the opportunity to secure the business of a known prospective client, resulting in Bryant losing approximately $12,000.00 in annual income. Additionally, the false and defamatory accusations outlined in this pleading caused former Governor Bryant to lose unidentified past and prospective clients, business opportunities, and associated income. The client and income losses outlined in this pleading will continue for the remainder of former Governor Bryant's work-life expectancy and years beyond.

12.4    The false and defamatory accusations outlined in this pleading caused former Governor Bryant to sustain non-economic damages, including, but not limited to, impairment of reputation and standing in the local, state, national, and business communities, personal humiliation, mental anguish, suffering, emotional distress, and other recoverable non-economic damages. Bryant demands all compensatory damages caused by the defamatory statements published by the defendants, including the special, general, economic, and non-economic damages outlined in this pleading.

12.5    Mrs. Bryant demands loss of consortium damages from all defendants.

12.6    The Bryants demand punitive damages, attorneys' fees, costs, and pre- and post-judgment interest from all defendants due to the malicious, bad-faith conduct outlined in this pleading.

**WHEREFORE, PREMISES CONSIDERED,** Phil and Deborah Bryant demand judgment against all defendants for the compensatory damages sought and proven at trial. The Bryants also demand punitive damages, attorneys' fees, costs, pre- and post-judgment interest, injunctive relief, and other available legal and equitable relief the Court deems appropriate.

Respectfully submitted, this 9th day of May 2024.

By:

William M. Quin II (MS Bar No. 10834)
W. Thomas McCraney III (MS Bar No.10171)
**McCraney Montagnet Quin & Noble, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
T:      601-707-5725
F:      601-510-2939
Email: wquin@mmqnlaw.com
          tmccraney@mmqnlaw.com

**Attorneys for the Honorable Phil Bryant and Former First Lady of the State of Mississippi, Deborah Bryant**