**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

---

PHIL BRYANT & DEBORAH BRYANT,

        Plaintiffs,

        v.                                      Civil No. 3:24-CV-260-KHJ-MTP

MICHAEL ROSENBERG &
THE ARENA GROUP HOLDINGS, INC.,

        Defendants.

---

## DEFENDANT THE ARENA GROUP HOLDINGS, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFFS' ALLEGATIONS ......................................................................... 2

    A.   The Mississippi Welfare Fraud Scandal ................................................ 2

    B.   Challenged Statements Versus What the Article Actually Says ......................... 4

    C.   False Light, Loss of Consortium, Injunctive Relief, and Respondent Superior ............................................................................................................ 9

III.    LEGAL STANDARD ......................................................................................... 10

IV.     ARGUMENT ...................................................................................................... 11

    A.   Plaintiffs Fail to Allege a Valid Defamation Claim Under Mississippi Law ............................................................................................................... 11

        1.   *Governor Bryant Has Not Alleged Actual Malice* ..................................... 11

        2.   *Governor Bryant Has Not Sufficiently Alleged a False and Defamatory Statement* ................................................................... 14

        3.   *Governor Bryant Has Not Alleged a Non-Privileged Communication* ...... 21

    B.   Governor Bryant Fails to State a Claim for False Light .................................. 23

    C.   Deborah Bryant Fails to State Claim for Loss of Consortium ......................... 24

V.      CONCLUSION ................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................10, 24

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007)........................................................................................................10

*Cook v. Mardi Gras Casino Corp.*,
  697 So.2d 378 .................................................................................................................23

*Cromwell v. Williams*,
  333 So. 3d 877 (Miss. Ct. App. 2022) ..........................................................................20

*Edmonds v. Delta Democrat Pub. Co.*,
  93 So. 2d 171 (Miss. 1957)............................................................................................22

*Fairbanks v. Roller*,
  314 F. Supp. 3d 85 (D.D.C. 2018) ................................................................................10

*Favre v. Sharpe*,
  No. 2:23-cv-42-KS-MTP, 2023 WL 7132949 (S.D. Miss. Oct. 30, 2023)...............3, 4, 16, 17

*Ferguson v. Watkins*,
  448 So.2d 271 (Miss. 1984)...........................................................................................15

*Garrison v. La.*,
  379 U.S. 64 (1964)..........................................................................................................12

*Greenbelt Cooperative Publishing Association v. Bresler*,
  398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)..........................................................15

*Harte–Hanks Communications, Inc. v. Connaughton*,
  491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).............................................12

*Hays v. LaForge*,
  333 So.3d 595 (Miss. App. 2022) .................................................................................23

*Hegwood v. Community First Holdings, Inc.*,
  546 F. Supp. 2d 363 (S.D. Miss. 2008)......................................................................2, 23

*Horsley v. Rivera*,
  292 F.3d 695 (11th Cir. 2002) .......................................................................................16

*Jernigan v. Humphrey*,
    815 So. 2d 1149 (Miss. 2002) ................................................................18

*Johnson v. Delta-Democrat Pub. Co.*,
    531 So. 2d 811 (Miss. 1988) ..........................................................14, 18

*Jones v. Browning*,
    2020 WL 265210 (S.D. Miss. Jan. 17, 2020) ......................................20

*Journal Pub. Co. v. McCullough*,
    743 So.2d 352 (1999) .........................................................11, 12, 13

*Letter Carriers v. Austin*,
    418 U.S. 264 (1974) ......................................................................15

*Levesque v. Doocy*,
    560 F.3d 82 (1st Cir. 2009) ............................................................13

*McDonald v. Raycom TV Broadcasting*,
    665 F. Supp. 2d 688, 690 (S.D. Miss. 2009) ....................................23

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C Cir. 1996) .........................................................14

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990) .........................................................................15

*Mitchell v. Random House, Inc.*,
    703 F. Supp. 1250 (S.D. Miss. 1988) ......................................10, 11, 14

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................15

*Palin v. New York Times Co.*,
    264 F. Supp. 3d 527 (S.D.N.Y. 2017) ..............................................11

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ..........................................................17

*Perkins v. Littleton*,
    270 So. 3d 208 (Miss. App. 2018) .........................................14, 15, 16

*Phil Bryant & Deborah Bryant v. Deep South d/b/a Mississippi Today, et al.*,
    Case No. 23-cv-238-JM (Madison Co. Cir. Ct.) ....................................3

*Pittman v. Gannet River States Pub. Corp.*,
    836 F. Supp. 377 (S.D. Miss. 1993) ...........................................22, 23

*Raycom TV Broadcasting,*
   665 F. Supp. 2d 688 (S.D. Miss. 2009)......................................................23

*Ryan v. Brooks,*
   634 F.2d 726 (4th Cir.1980) ...............................................................13

*Texas Beef Grp v. Winfrey,*
   201 F.3d 680 (5th Cir. 2000) .........................................................15, 18

*Trout Point Lodge Ltd. v. Handshoe,*
   2012 WL 12884834 (S.D. Miss. Dec. 19, 2012) ..................................20

*Trout Point Lodge, Ltd. v. Handshoe,*
   729 F.3d 481 (5th Cir. 2013) .......................................................15, 20

**Statutes, Rules & Regulations**

Fed. R. Civ. P. 8(a)(2)...............................................................................10

Fed. R. Civ. P. 12(b)(6).........................................................................1, 10

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant The Arena Group Holdings Inc. ("Arena Group") respectfully moves this Court for an order dismissing all claims asserted by Plaintiffs Phil and Deborah Bryant for failure to state a claim upon which relief can be granted.

## I.   **INTRODUCTION**

Former Governor Phil Bryant and First Lady Deborah Bryant allege defamation, as well as derivative claims for false light, loss of consortium, injunctive relief, and respondent superior based on an article reporting on the widely publicized welfare scandal that resulted in the arrest and subsequent guilty pleas for numerous state officials and that has been the subject of widespread, and Pulitzer Prize winning, reporting. The article in question was written by acclaimed sportswriter and co-defendant Michael Rosenberg and published on May 18, 2023 by Sports Illustrated magazine which was, at the time, published by Arena Group. Plaintiffs' claims fail as a matter of law and the Complaint should be dismissed.

The Article provides well-sourced information concerning NFL Hall of Fame quarterback Brett Favre's role in now well-known allegations regarding misuse of state welfare money. The Article relied on first-party interviews, legal filings from civil and criminal proceedings, and publicly available text messages between Governor Bryant and Favre that came to light in connection with the State of Mississippi's lawsuit to recover the allegedly misappropriated funds. Governor Bryant— who is indisputably a public figure—does not challenge the authenticity or veracity of the text messages or most of the official sources quoted in the Article or the underlying factual account detailing an issue of public concern. Rather, Plaintiffs challenge eighteen (18) statements that are, as a matter of law, not actionable and risk chilling free expression contrary to core protections afforded by the First Amendment and Mississippi law. The Article is not actionable defamation or false light, and Plaintiffs' claims should be dismissed for three separate and independent reasons:

*First*, as a public figure, Governor Bryant must allege that Arena Group acted with "actual malice" to state a valid claim for Defamation or False Light. The Complaint does not contain any factual allegations suggesting that Arena Group, or Rosenberg for that matter, knew that the statements reported were false or acted with reckless disregard for the truth. The claims for defamation and false light should be dismissed on that pleading failure alone.

*Second*, none of the challenged language is a "clear and unmistakable" false or defamatory statement that is not the product of innuendo, speculation, or conjecture. It is well-established law that truth is not actionable, nor is an author's rhetorical hyperbole, characterizations of the public fraud proceedings, and/or "implications" of his language. Plaintiffs do not dispute the underlying facts, including Governor Bryant's first-party text messages; rather Plaintiffs seek to improperly rely upon innuendo, speculation, or conjecture that are not actionable under Mississippi law.

*Third*, Arena Group is shielded from liability by Mississippi's fair comment privilege, which broadly protects editorial commentary when the underlying factual basis is disclosed and pertains to matters of public concern. Plaintiffs do not and cannot overcome that bar on litigation.

Plaintiffs' related claims for Injunctive Relief and Respondent Superior lack any separate predicate and fail with the underlying claims. Finally, the former First Lady asserts a bald claim for Loss of Consortium that fails to meet the minimum pleading standard. The Complaint should be dismissed.

## II.   <u>PLAINTIFFS' ALLEGATIONS</u>

### A.   **The Mississippi Welfare Fraud Scandal**

On May 18, 2023, Sports Illustrated published an article by Senior Writer Michael Rosenberg titled "'The Driving Force:' How Brett Favre's Demands for Cash Fueled a Scandal" (the "Article").

Compl. ¶ 1.1, *id.* at Ex. 1 (Dkt. Nos. 1-1, 1-2).[1] In the Article, Rosenberg provides details regarding

one of the "largest public funds fraud scandals in Mississippi history," which has been the subject

of widespread local and national reporting as well as prior lawsuits. *See, e.g., Favre v. Sharpe*, No.

2:23-cv-42-KS-MTP, 2023 WL 7132949, at *1 (S.D. Miss. Oct. 30, 2023); Compl. ¶ 1.3 (citing *Phil*

*Bryant & Deborah Bryant v. Deep South d/b/a Mississippi Today, et al.*, Case No. 23-cv-238-JM

(Madison Co. Cir. Ct.).) The Article "set[s] out to explain and examine" NFL Hall of Fame

quarterback Brett Favre's role in the scandal based on "[i]nterviews and an analysis of legal filings

and records" and "dozens of text conversations." Ex. 1 (Dkt. 1-1) at 2-5. The Article discusses

Favre's interactions with former Governor Bryant, former Department of Human Services (MDHS)

Executive Director John Davis, and former Community Education Center (MCEC) Director Nancy

New. Compl. ¶ 1.2. The Court in *Favre v. Sharpe* summarized the scandal as follows:

> In or around October 2021, the Mississippi Office of the State Auditor determined,
> based on an independent forensic audit commissioned by the Mississippi Department
> of Human Services, that more than $77 million dollars in federal Temporary
> Assistance for Needy Families ("TANF") funds had been diverted from their
> statutory purpose and spent illegally.
>
> This welfare scandal has resulted in significant criminal charges. To date, six
> individuals have pled guilty to state or federal felonies, or both, related to their
> involvement in the scandal, including the former Executive Director of the
> Mississippi Department of Human Services, four executives of non-profit
> organizations that received and spent welfare funds, and a retired professional
> wrestler. While Favre has never been criminally charged, the State of Mississippi's
> Department of Human Services ("MDHS") filed a civil lawsuit against Favre and his
> company, Favre Enterprises, along with many others, seeking to recover the misspent
> welfare dollars. . . .
>
> The welfare scandal—and Favre's role in it—have generated substantial media
> attention. It is believed that Favre's involvement in the scandal first broke on
> February 27, 2020, in a Mississippi Today article, "Embattled welfare group paid $5
> million for new USM volleyball center." Since then, a number of local and national
> news organizations have reported on the ongoing developments in the welfare
> scandal, including specifically Favre's involvement in it.

---

[1] All referenced Exhibits were filed as attachments of, and are therefore incorporated by reference to, the Complaint.

*Favre*, 2023 WL 7132949 at *1-2.[2]

In April 2022, Mississippi Today published a five-part series called "Backchannel" that discussed, *inter alia,* Governor Bryant's involvement in the welfare scandal. Compl. ¶ 1.3. Plaintiffs allege the Article is based on that series and "repackages" its reporting. *Id.* That series won the Pulitzer Prize and while Bryant has filed a civil suit against Mississippi Today (*id.*), that suit does not allege defamation based on the Backchannel series. *See* Ex. 2. Ongoing litigation has added to the public record regarding Governor Bryant's involvement in the underlying facts. *See, e.g.*, *Miss. Dept. of Human Services vs. Miss. Commc'n Educ. Ctr., Inc., et al*., Case No. 22-cv-286-EFP (Hinds Cty. Cir. Ct.) at Dkt. 140 (Response in Opposition to MCEC's Motion to Compel the Hon. Phil Bryant to Produce Documents Responsive to Subpoena Duces Tecum); Dkt. 375 (Defendant Austin Garrett Smith's Motion to Join Former Governor Phil Bryant and Current Governor Tate Reeves as Necessary Party Defendants); Dkt. 679 (Motion for Leave to File Third-Party Complaint).

**B.      Challenged Statements Versus What the Article Actually Says**

While the Complaint challenges what the Article allegedly "implies," Plaintiffs do not and cannot assert that any of the statements, text messages, interviews, and other official records cited are inaccurate or inauthentic. *See, e.g.*, Compl. ¶ 6.10 (alleging Article "implies" Bryant "engage[d] in a scheme to misspend public funds"); *id*. ¶ 6.27 (alleging "[t]he statement implies that Bryant conspired with Favre"); *id*. ¶ 6.33 (challenging statement that allegedly "implies that Bryant directed Favre"). Significantly, the facts reported in the well-researched Article are not challenged.

There is a disconnect between Plaintiffs allegations and the Article. The below chart details the allegedly "false and defamatory" statements alongside the actual content of the Article:

---

[2] This Court may take judicial notice of information concerning the scandal since it is in the public sphere and provides important context to the defamation claims in the Complaint. *Favre*, 2023 WL 7132949 at *1 n1.

| Allegedly False or Defamatory Statements | What the Article Said |
|---|---|
| "Bryant did not instruct anyone to use TANF funds to construct the USM volleyball facility. Bryant did not instruct anyone to invest TANF funds in Prevacus. The quoted statement is false and defamatory." Compl. ¶¶ 6.3-6.5. | "New was mostly following orders from Davis, the welfare chief. Davis largely operated on behalf of Mississippi's then-governor, Republican Phil Bryant. And Bryant worked relentlessly to please the state's most famous athlete, NFL legend Brett Favre." Compl. ¶ 6.1 |
| "Bryant did not engage in 'illegal behavior;' he did not 'outmanuever [] the others;" he did not plot with Davis, New, Favre, or anyone else to violate the law; and he did not plot against Davis, New, Favre, or anyone else regarding illegal behavior. The Article's statements to the contrary are false and defamatory." Compl. ¶ 6.7.<br><br>"Bryant is not a defendant in the civil action brought by the Mississippi Department of Human Services to recoup misspent welfare funds; he is not a defendant in any criminal action; he has not been notified that he is a target of any investigation; and no civil or criminal case involves the "theme" that Bryant plotted with or against anyone."  Compl. ¶ 6.8. | "Favre was a leading character in a drama full of political alliances and personal favors; of celebrities and their sycophants; of unchecked power and unconscionable use of federal [TANF] funds. Illegal behavior was so institutionalized that some perpetrators showed no fear of getting caught. One of Favre's business partners referred to Bryant as part of his 'team,' to which the governor replied, in part: 'We will get this done,' according to texts Sports Illustrated obtained over the course of several months of reporting. The governor texted Favre about 'our cause.'<br>When it unraveled – starting with an accidental, seemingly innocuous discovery – the most powerful players started outmaneuvering the others. Eventually, people who plotted with one another plotted against one another – a theme that continues to play out in both ongoing civil and criminal cases." Compl. ¶ 6.6. |
| "Bryant did not engage in a 'scheme' to misspend public funds in constructing the USM volleyball facility. The Article implies otherwise and, accordingly, is false and defamatory." Compl. ¶ 6.10. | "'Hey governor this brett Favre.'<br>He got to the point quickly: 'Deanna [his wife] and I are building a volleyball facility on campus and I need your influence somehow to get donations and or sponsorships. Obviously Southern has no money so I'm hustling to get it raised.'<br>Bryant, who was returning from a trip to Cuba, wrote back:<br>'Of course I am all in on the Volleyball facility. Y'all have fun and next week come see me. We will have that thing built before you know it one thing I know how to do is raise money.'<br>Bryant finished with the thumbs-up emoji. He said he was going on a turkey-hunting trip |

| | |
|---|---|
| | soon but would meet Favre for lunch when he returned.<br><br>From there, the scheme developed with startling efficiency." Compl. ¶ 6.9. |
| "Bryant did not have advanced or contemporaneous knowledge of Davis's commitment and did not approve of it. The defendants' publication and endorsement of Carol Burnett's baseless speculation are defamatory." Compl. ¶ 6.12. | "It was as though Davis knew he would deliver the money before the meeting. Bryant's lawyers would later say he had no knowledge of or involvement in" the meeting or the $4 million commitment. But Mississippi Low-Income Child Care Initiative founder Carol Burnett, who worked in MDHS in the early 2000s, tells SI, 'The head of DHS doesn't make those decisions without the governor's knowledge and approval. That is just unfathomable to me.'" Compl. ¶ 6.11. |
| "The Article's statement that Bryant provided 'a large, legally dubious' favor for Favre is false and defamatory." Compl. ¶6.17. | "Those were legal favors. But Favre would soon push Bryant for a large, legally dubious one – and he didn't have to push very hard." Compl. ¶ 6.13. |
| "Bryant did not participate in a volleyball scheme, there was no Bryant-to-Davis-to-New-to-Favre chain, and he did not engage in any criminal activity. Bryant would not have implicated himself in criminal activity or actions giving rise to civil liability had he told White about the volleyball facility or Prevacus. The quoted statements are false and defamatory.'" Compl. ¶ 6.19. | "The volleyball scheme was almost complete. But there was about to be a break in the Bryant-to-Davis-to-New-to-Favre chain. During a routine internal MDHS audit, an auditor noticed that one of Brett DiBiase's MDHS paychecks went to a post office box belonging to John Davis, people familiar with the case said. That was not normal, and Davis's relationship with the DiBiases had already raised suspicions. The internal auditor reported it. Then DHS deputy director Jacob Black turned Davis into the man who was best positioned to end the corruption: Governor Phil Bryant. Bryant had no choice. Ignoring this would be an obvious crime – with witnesses. Bryant alerted the state auditor, Shad White – who was Bryant's former campaign manager and a Bryant appointee. But the governor appears not to have told White about the volleyball facility or Prevacus – which, of course, would have implicated himself." Compl. ¶ 6.18. |
| "Bryant did not participate in a scheme to do anything illegal or unethical with Favre, New, or anyone else. The statement is false and defamatory." Compl. ¶ 6.21. | "With Davis out, the scheme was down to three principals: Phil Bryant, the veteran pol. Brett Favre, the relentless competitor. Nancy New, the naïve pleaser." Compl. ¶ 6.20. |

| | |
|---|---|
| "The statement implies Bryant conspired with Favre to defraud the state of public funds, which is false and defamatory." Compl. ¶ 6.27. | "Bryant should have seen it was time to end this. But the governor just wouldn't quit Brett Favre." Compl. ¶ 6.26. |
| "Freeze and Bryant were not old friends, and Bryant did not send a text that made 'him seem only vaguely aware of the volleyball project.' Bryant was vaguely aware of the volleyball project. Bryant was not involved with planning the project, crafting the project, crafting the associated lease agreement, or approving or directing funds for the project. This statement is false and defamatory." Compl. ¶ 6.29 | "Bryant tapped his old friend Chris Freeze, a retired FBI agent, to replace Davis. Almost immediately, Bryant sent a staff attorney a text that made him seem only vaguely aware of the volleyball project: 'Can we check with Nancy New and what the contract with Southern Miss is all about. Brett is asking for info on the proposed funding.'" Compl. ¶ 6.28. |
| "Bryant did not suddenly change from openly enthusiastic to detached and cautious. Bryant was not involved with planning the project, crafting the associated lease arrangement, or approving or directing funding for the project. The statement is false and defamatory." Compl. ¶ 6.31. | "Favre and New finally took note of Bryant's sudden change from openly enthusiastic to detached and cautious." Compl. ¶ 6.30. |
| "Bryant was not more candid with Favre on the phone; he did not speak with Favre." Compl. ¶ 6.33 | "But on the phone with Favre, Bryant was more candid – and Favre then texted New what Bryant had said, inadvertently creating a record of it." Compl. ¶ 6.32. |
| "Bryant did not direct MDHS to fund projects or instruct Favre on crafting a proposal that MDHS would approve. The statement is false and defamatory." Compl. ¶ 6.33 | "Bryant told Favre via text that he hadn't seen the proposal: 'Nancy has to provide the proper documentation to MDHS.' Then Bryant talked to Favre on the phone. And then Favre texted New: 'He said to me just a second ago that he has seen it but hint hint that you need to reword it to get it accepted.'" Compl. ¶ 6.32. |
| "Bryant never assured Favre that he would direct MDHS or TANF funds toward the construction of the volleyball facility. The statement is false and defamatory." Compl. ¶ 6.35. | "Bryant portrayed himself as forthright and proper: 'As always I am not going to interfere.' … as being too busy to monitor MDHS funding: 'You got a better understanding than I do of these projects.' … and as out of the loop for years: 'I think Brett was told it was going to get done by the previous Director. One of the reasons that he is a former Director.' Bryant apparently wanted Freeze – or whoever might be reading his texts – to believe he had fired Davis, at least in part, for promising to fund the volleyball facilities. But Bryant had repeatedly made the same assurance to Favre for years – and he kept doing it." Compl. ¶ 6.34. *See also* Ex. 1 (Dkt. 1-1) at 17 ("[F]avre texted Bryant: 'It's 3d and |

| | |
|---|---|
| | long and we need you to make it happen!!' Bryant wrote back: 'I will open a hole.'"); *id.* (Dkt. 1-2) at 3 (Favre wrote to Bryant: "I and we need your help very badly governor and sorry to even bring this up." And Bryant texted him: "I will handle that . . . long story short but had to make a change. But I will call Nancy and see what it will take.'"). |
| "Bryant did not set a trap; he did not make it look like New was the perpetrator; he did not make it look like Favre was the accomplice; and he did not make it look like he was the honest occasional advisor. The statement is false and defamatory." Compl. ¶ 6.37. | "The trap had been set. If the volleyball scheme were to blow up – which it would, a few months later – Bryant had made it look like New was the perpetrator, Favre the accomplice and Bryant the honest occasional advisor. But first Bryant kept telling Favre he would try to get him his money." Compl. ¶ 6.36. |
| "Bryant did not sell Favre out. The statement is false and defamatory." Compl. ¶ 6.39. | "On Feb. 2, Favre stood on the field before the Super Bowl wearing a maroon sport coat, enjoying another compliment in a life overflowing with them. The NFL had named him one of the 100 best players of its first century. As he waved to fans alongside other legends in South Florida, Favre apparently did not realize that back in Mississippi, Phil Bryant was selling him out." Compl. ¶ 6.38. *See also* Ex. 1 (Dkt. 1-2) at 16 (quoting text message from Governor Bryant to President of USM: "'Maybe [Favre] wants the State to pay off his promise. Like all of us I like Brett. He is a legend but he had to understand what a pledge means. I have tried many time [*sic*] to explain that to him.") |
| "Bryant did not tell White that Davis was funneling government money to the DiBiases; no trail leads to Bryant; and law enforcement did not find 'explosive texts implicating Bryant and Favre that eventually became public.'" Compl. ¶ 6.41. | "Shad White would say publicly he was alerted to the fraud by a whistleblower: Former Mississippi Governor Phil Bryant. After all, Bryant had told White that John Davis was funneling government money to the DiBiases, triggering the inquiry. White almost certainly did not know the trail would lead to Bryant. But during the course of the investigation, law enforcement found explosive texts implicating Bryant and Favre that eventually became public." Compl. ¶ 6.40. |
| "There is a reason why Bryant is not a party to any criminal or civil case arising out of the MDHS fraud. He did nothing illegal. These statements are false and defamatory." Compl. ¶ 6.41 | |
| "Bryant never indicated he would accept Prevacus stock. He did not run out of time to do so and did not suddenly change his mind. | "Though the former governor indicated he would accept Prevacus stock, he either ran out of time or suddenly changed his mind before |

| | |
|---|---|
| This statement is false and defamatory." Compl. ¶¶ 6.43-44. | the arrests." Compl. ¶ 6.42; *see also* Ex. 1 (Dkt. 1-1) at 16 ("On Dec. 6, 2018, Prevacus CEO Jake Vanlandingham texted Bryant: 'We want you to know that we want you on the team and can offer stock.'"); *Id.* (Dkt. 1-2) at 14 ("Two days after Bryant became a private citizen again, Prevacus CEO Jake VanLandingham texted him, offering stock. VandLandingham described it as 'a company package for all your help.' Bryant wrote back: 'Sounds good. Where would be the best place to meet? I am going to get on it hard.'" ) |
| "The undersigned did not state in any court filing that 'Bryant didn't know the money Favre wanted came from TANF because Favre never mentioned it.'" Compl. ¶ 6.46 | "Bryant's lawyers have argued in a court filing that New and Davis embezzled MDHS funds 'unbeknownst to Bryant.' They have said Bryant didn't know the money Favre wanted came from TANF because Favre never mentioned it." Compl. ¶ 6.45. |

### C.    False Light, Loss of Consortium, Injunctive Relief, and Respondent Superior

Plaintiffs' other causes of action are derivative of the defamation claim and arise from the same well-sourced Article. Specifically, Governor Bryant also asserts a claim of False Light, and Plaintiffs bring claims for injunctive relief and respondent superior. Compl., Counts 2-5. Each of these causes of action are based on the same Article and statements that form the basis of Count 1. Compl. ¶ 8.3 (relying exclusively on "[t]he preceding statements"); ¶ 10.4 (alleging "Arena is vicariously liable" for the Article's defamation); ¶ 11.3 (seeking removal of the Article). Other than Rosenberg's undisputed employment by Arena Group during the relevant time period, no additional facts or allegations are offered for these three Counts.

Finally, former First Lady Deborah Bryant asserts a Loss of Consortium claim. The lone allegation in support of that Count states "[t]he defendants have caused Deborah Bryant to suffer recoverable losses of consortium." Compl. ¶ 9.3. Ms. Bryant is mentioned only six times in the Complaint: in the caption, introductory statement, parties, and in the legal conclusion for the loss of consortium claim. *See* Compl. p. 1; ¶¶2.2, 9.1-9.3. No facts or supporting evidence is pled.

III.   **LEGAL STANDARD**

Pursuant to Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, a pleading must be detailed enough to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face," so that groundless claims can "be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 570 (internal quote and citation omitted). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true . . . ." *Twombly*, 550 U.S. at 555. Where a complaint does "not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Because the actual statements that form the basis of a libel claim are often before the Court at the pleading stage, such actions lend themselves "to judicial scrutiny in the early stages of a defamation lawsuit." *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1258 n. 10 (S.D. Miss. 1988). For that reason, "[d]ismissal of defamation suits for failure of the complaint to state a cause of action or to state a claim upon which relief can be granted occurs with relative frequency." *Id.* (quoting R. Sack, Libel, Slander and Related Problems 533–34 (1980)). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) 'not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive.'" *Fairbanks v. Roller*, 314 F. Supp. 3d

85, 89 (D.D.C. 2018) (quoting *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017).) Thus, in assessing a motion to dismiss for failure to state a defamation claim, the trial court may, at the pleading stage, "make sound determinations as to issues relating to the communication of which complaint is made," including "whether the statement at bar is capable of bearing a defamatory meaning, whether it is 'of and concerning' the plaintiff, whether it is protected opinion, whether there is jurisdiction over the defendant, and whether the suit is barred by privilege." *Mitchell*, 703 F. Supp. at 1258 n. 10. In making those determinations, the Court may go beyond the Complaint and "may assess [the article] upon a motion to dismiss first hand and in context." *Id.*

## IV.   ARGUMENT

The Complaint must be dismissed because Plaintiffs failed to state any claim for which relief can be granted. Governor Bryant's defamation and false light claims (along with the counts for injunctive relief and respondent superior, which are based on the same allegations) fail for three, independent reasons: (1) there are no allegations to support an inference of actual malice; (2) the statements complained of are, as a matter of law, not false or defamatory; and (3) the Article is protected by the fair reporting privilege. Finally, Deborah Bryant failed to allege *any* facts to support her claim for loss of consortium and it must be dismissed.

### A.   Plaintiffs Fail to Allege a Valid Defamation Claim Under Mississippi Law

To state a claim for defamation under Mississippi law, a public figure such as Governor Bryant must allege: (1) a false and defamatory statement directed at the plaintiff; (2) an unprivileged publication to a third party; (3) actual malice on the part of the publisher; and (4) actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Journal Pub. Co. v. McCullough*, 743 So.2d 352, 359 (1999). Here, as set forth below, Plaintiffs have failed to plausibly allege any of the first three elements of a defamation claim.

### 1.   *Governor Bryant Has Not Alleged Actual Malice*

Governor Bryant is undisputedly a public figure who must allege actual malice to state a valid claim; however, the Complaint is devoid of factual allegations to plausibly support his conclusory claim that Arena Group acted with actual malice. Compl. ¶¶ 7.2, 7.3(c). Rather, the Article confirms that Rosenberg relied on reputable sources and the Complaint does not because it cannot provide any evidence to show that Arena Group "departed from reasonable standards" or subjectively "entertained serious doubts" about the credibility of the information in the Article. Thus, the Complaint fails to state a valid claim and Count 1 must be dismissed.

Where the defamed party is a public figure, he must allege that the defendant made the complained of statements with actual malice—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not, while entertaining subjective doubt as to the truth of the statement." *McCullough*, 743 So.2d at 359. "A reckless disregard for the truth requires more than a departure from reasonably prudent conduct" and there must be sufficient allegations to permit the inference "that the defendant in fact entertained serious doubts as to the truth of his publication." *Id*. at 361 (quoting *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). This is a subjective standard, and when applied in the case of a publication like Sports Illustrated, "a public figure plaintiff such as [Bryant] must prove more than an extreme departure from professional standards or personal spite on the part of the defendants." *Id*. at 361-62. Given the risk of chilling freedom of speech, a plaintiff must show "a high degree of awareness of . . . probable falsity." *Garrison v. La.,* 379 U.S. 64, 74 (1964).

The Complaint does not provide sufficient factual allegations from which this Court could plausibly conclude that Arena Group "entertained serious doubts as to the truth" of the statements published in the Article or took more than an extreme departure from professional standards. At best, the Complaint includes two allegations focused on potential malice: (1) "Rosenberg relied on information provided to him by Nancy New or individuals aligned with her and disregarded a

12

mountain of objective evidence proving Bryant did not direct TANF funding to the USM volleyball facility project or Prevacus" (Compl. ¶ 6.24), and (2) Rosenberg "ignored the integrity and conclusions of every state and federal investigator who reviewed the case." *id.* ¶ 6.25. These bald statements are insufficient to meet the pleading standard for actual malice and do not suggest that either defendant entertained a "subjective doubt as to the truth of the [Article]." *McCullough*, 743 So.2d at 359. Tellingly, the Complaint does not identify the "mountain of objective evidence" or the specific conclusions of any state or federal investigator that Rosenberg purportedly ignored. Plaintiffs' conclusory statements are not enough to meet the minimum threshold.

Moreover, even if that could advance a claim, the Article itself confirms that Rosenberg relied on a mountain of objective evidence. Compl. Ex. 1. For example, the Article quotes and discusses filings from civil and criminal proceedings as well as text messages between relevant individuals including between Bryant and Favre. The Article also provides attributed quotes from knowledgeable individuals ranging from former State Auditor Shad White to former U.S. Attorney Brad Pigott. *See id.*

The Article also relies upon the "exemplary reporting on all aspects of the scandal" published by Mississippi Today's Anna Wolfe which won a Pulitzer Prize. *Id.* at 5. Where a publisher relies in good faith on previously published information from reputable sources, a finding of actual malice is precluded as a matter of law. *See, e.g.*, *Levesque v. Doocy*, 560 F.3d 82, 91 (1st Cir. 2009) (finding no actual malice where defendants authenticated facts reported in article through reputable sources); *Ryan v. Brooks*, 634 F.2d 726, 734 (4th Cir.1980) ("As long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error.") (citations omitted). Even if some of the sources were found to be of questionable reliability (as Plaintiffs allege regarding Ms. New), that would still be insufficient

to support a finding of actual malice. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509 (D.C Cir. 1996) (holding that a publisher who "relies upon a questionable source" does not have a duty to corroborate the truth of the source's allegations through another, independent source because that would improperly turn the actual malice standard into an objective standard of care). Plaintiffs have not alleged, and cannot allege, actual malice; thus, the Complaint should be dismissed on that basis alone.

   2.   *Governor Bryant Has Not Sufficiently Alleged a False and Defamatory Statement*

Governor Bryant's defamation claim is independently defective because he has not sufficiently alleged that any statement in the Article is false or defamatory as a matter of law. Under Mississippi law, defamation must be "clear and unmistakable from the words themselves and not the product of innuendo, speculation, and conjecture." *Johnson v. Delta-Democrat Pub. Co.*, 531 So. 2d 811, 813 (Miss. 1988). Here, Governor Bryant's defamation allegations generally fall into three categories, each insufficient to state a claim for defamation: (a) constitutionally-protected rhetorical hyperbole and statements of opinion; (b) Bryant's own inflammatory implications that do not accurately reflect the language used in the Article; and (c) substantially true statements. None of these categories can stand valid defamation.

   a.   *Rhetorical Hyperbole and Opinions are Constitutionally-Protected*

The twelve (12) statements set forth in Sections I, III, V, VI, VII, VIII, IX, XI, XII, XIII, XIV, XV of the Complaint are not false or defamatory as a matter of law because they are constitutionally-protected rhetorical hyperbole and statements of opinion.

A trial court in a defamation case is required to "make a threshold determination of whether the language in question is actionable." *Mitchell*, 703 F. Supp. at 1256. That standard must be strictly enforced and may be decided by the Court without submission to the trier of fact. *Johnson*, 531 So. 2d at 813; *Perkins v. Littleton*, 270 So. 3d 208, 216 (Miss. App. 2018) ("In the procedural life of a

defamation suit, the court determines whether the statement bears the meaning ascribed to it by the plaintiff and whether this meaning is defamatory. If the court decides against the plaintiff on either of these questions, the case is ended."). In making this threshold determination, courts should keep in mind the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public official." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). "[L]oose, figurative" language, "rhetorical hyperbole," and a "vivid imagination" are protected under the First Amendment. *Milkovich v. Lorain J. Co*., 497 U.S. 1, 20-21 (1990); *Perkins*, 270 So. 3d at 216. So, too, are expressions of opinion so long as they do not "clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion." *Ferguson v. Watkins*, 448 So.2d 271, 276 (Miss. 1984).  In other words, as long as an opinion does not contain a "provably false factual connotation" and is based on "factually accurate premises," it is not actionable defamation.  *See Texas Beef Grp v. Winfrey*, 201 F.3d 680, 699 (5th Cir. 2000) (finding no defamation where opinions, though strongly stated, "were based on truthful, established fact, and are not actionable under the First Amendment"); *see also Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 493 (5th Cir. 2013) (allegation that defendant used "unabashed anti-gay, anti-homosexual rhetoric and rants" and described individuals as a "litigious bunch" not sufficient to state defamation claim because these statements were "unverifiable opinion").

Applying this standard, courts have found that statements using suggestively criminal terms like "conspire," "traitor," and "blackmail" outside of a criminal context do not provide a valid basis for a defamation claim. *Perkins*, 270 So.3d at 217 (finding "conspiracy" not actionable); *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (characterizing negotiating tactics as "blackmail" was not actionable); *see also Letter Carriers v. Austin*, 418 U.S. 264, 284-286 (1974) (holding use of "traitor" in describing a union "scab" was not

a basis for a defamation action because it was used "in a loose, figurative sense" that was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members"); *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (finding television host calling plaintiff an "accomplice to murder" was nonactionable rhetorical hyperbole "expressing his belief that [plaintiff] shared in the moral culpability for [an individual's] death, not as a literal assertion that [plaintiff] had, by his actions, committed a felony"). While these statements could, in certain contexts, imply criminal activity, implication is not defamation, and "this is hardly the 'clear and unmistakable' import of 'the words themselves.'" *Perkins*, 270 So.3d at 217.

This Court's recent dismissal of Favre's defamation claims against a sports show host concerning statements regarding the same public scandal is instructive. *Favre v. Sharpe*, 2023 WL 7132949, at *5 (S.D. Miss. Oct. 30, 2023). Favre filed a defamation suit alleging that three statements—"you've got to be a sorry mofo to steal from the lowest of the low," "Brett Favre is taking from the underserved," and "[Favre] stole money from people that really needed the money"—created the impression that Favre committed the crime of larceny while he alleged that he did not "steal" and had not been charged with stealing money. *Id*. In granting the defendant's Motion to Dismiss, the Court rejected Favre's proposed standard and found that the statements were not defamatory as a matter of law.

> [T]he Court also acknowledges that from the reports in the public arena after government investigations, forensic audits, civil litigation, Favre's text messages, and Favre's own implicit admission by returning $1.1 million dollars to the State, it appears to be widely believed that the money obtained by Favre for himself and USM came from welfare funds. Although the funds may have come from the State of Mississippi, such TANF funds were intended to go to poverty-stricken families, not to fund the construction of a college volleyball facility. In that context, just as the Supreme Court has held that saying a negotiator engaged in "blackmail" or calling a non-union employee a "traitor" is constitutionally-protected rhetorical hyperbole and loose, figurative language, the Court finds that Sharpe's use of the words "steal," "taking," and "stole" in connection with Favre's actions is non-actionable speech.

*Id*. at *6-7. The same result is warranted for the 12 statements in this case fitting the same description.

16

Governor Bryant asks this Court to find liability based on use of the terms and phrases such as "plot," "outmaneuver," "scheme," "legally dubious," "implicated," "trap," and "sell out" because he contends, they imply illegal activity. Compl. ¶¶ 6.7, 6.10, 6.17, 6.18, 6.37, 6.39. But just like the use of the terms "conspiracy," "traitor," "blackmail," and "stole," a criminal implication is not clear and unmistakable from the words themselves. Even if the words imply criminality, that is insufficient to state a valid claim. Rather, when viewed against the same backdrop as in *Favre v. Sharpe* along with the additional reporting and evidence cited in the Article, Rosenberg's choice of language is not a "literal assertion that [Bryant] had, by his actions, committed a [crime]" but remains, at most, nonactionable rhetorical hyperbole.

A close review of the Complaint confirms that Governor Bryant does not take issue with the **facts** set forth in the Article, but only Plaintiffs' gloss on Rosenberg's alleged **opinions**. *See Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995) (holding that "one must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact."). For example, Governor Bryant objects to the following statements from the Article:

- "Bryant tapped his **old friend** Chris Freeze, a retired FBI agent, to replace Davis. Almost immediately, Bryant sent a staff attorney a text that **made him seem only vaguely aware** of the volleyball project: 'Can we check with Nancy New and what the contract with Southern Miss is all about. Brett is asking for info on the proposed funding.'" Compl. ¶ 6.28 (emphasis added).

- (Describing a text sent by Bryant) "Favre and New finally took note of Bryant's sudden change from openly enthusiastic to detached and cautious." Compl. ¶ 6.30.

- "Shad White would say publicly he was alerted to the fraud by a whistleblower: Former Mississippi Governor Phil Bryant. After all, Bryant had told White that John Davis was funneling government money to the DiBiases, triggering the inquiry. White almost certainly did not know **the trail would lead** to Bryant. But during the course of the investigation, law enforcement found **explosive texts implicating Bryant and Favre** that eventually became public." Compl. ¶ 6.41 (emphasis added).zzmpShiftReturn

Governor Bryant does not challenge the factual content. For example, he does not deny that he sent the quoted text message to a staff attorney, does not deny that Shad White publicly stated he was

alerted to the fraud by Governor Bryant, and does not deny that law enforcement found text messages. *See* Compl. ¶¶ 6.29, 6.41. Instead, he takes issue with Rosenberg's opinions. Even if accepted as true, Rosenberg's rhetorical hyperbole and/or opinions referring to Freeze as the Governor's "old friend," that the text messages are "explosive," suggest a "trail [that] would lead to Bryant," reflect a "sudden change" or made Bryant seem "only vaguely aware" are not statements containing a "provably false factual connotation" and are "based on factually accurate premises;" thus, the statements are not actionable under the First Amendment. *Texas Beef Grp.*, 201 F.3d at 688 (finding opinions that "Mad Cow Disease" could exist or be discovered were based on fact and were therefore not actionable). The same is true here. The 12 statements in Sections I, III, V, VI, VII, VIII, IX, XI, XII, XIII, XIV, and XV are non-actionable hyperbole and opinion that are constitutionally protected and fail to set forth a valid basis for a defamation claim.

> b.  *The Allegedly Defamatory Statements Do Not Accurately Reflect the Content of the Article*

The eight (8) statements set forth in Sections I, II, IV, VIII, X, and XI, XII, and XVI are not false and defamatory as a matter of law because the allegations set forth in the Complaint are based on the implications Governor Bryant purports to draw from the Article, not the actual published statements. Governor Bryant cannot plead falsity by imputing words to the Article that were never printed; rather, "the defamation must be clear and unmistakable from the words themselves." *Johnson*, 531 So.2d at 813; *see also Jernigan v. Humphrey*, 815 So. 2d 1149, 1155 (Miss. 2002) (statements "based on truthful, non-defamatory facts" cannot support a defamation claim).

For example, Bryant alleges that the Article is defamatory because he "did not instruct anyone to use TANF funds to construct the USM volleyball facility" and "did not instruct anyone to invest TANF funds in Prevacus." Compl. ¶¶ 6.3-6.4. The Article, however, never makes these claims, and Bryant does not cite a statement from the Article to support these allegations. Neither

the word "instruct" nor synonyms such as "direct," "order," or "compel" appear in the language quoted as the basis for Section I's alleged defamation. Compl. ¶ 6.1. Rather, Plaintiff quotes a paragraph that mentions Bryant only once by observing "And Bryant worked relentlessly to please the state's most famous athlete, NFL legend Brett Favre." *Id.* Governor Bryant cannot create strawman allegations to deny as false based on language that does not appear in the Article.

Similarly, Bryant alleges that the Article is defamatory because he "did not have advanced or contemporaneous knowledge of Davis' commitment and did not approve of it." Compl. ¶ 6.12. The Article does not say he did. In fact, the Article acknowledges Bryant's denial, stating: "Bryant's lawyers would later say he had 'no knowledge of or involvement in' the meeting or the $4 million commitment. But Mississippi Low-Income Child Care Initiative founder Carol Burnett, who worked in MDHS in the early 2000s, tells SI, 'The head of DHS doesn't make those decisions without the governor's knowledge and approval. That is just unfathomable to me.'" Compl. ¶ 6.11. The Article's truthful reporting of events does not become defamatory simply because it quoted a source (whose credibility Bryant does not challenge) who questioned the Governor's denial. Likewise, the Article does not say that Governor Bryant is a defendant in any pending civil or criminal action, that he has been notified that he is a target of an investigation, or that his behavior was illegal, as Bryant alleges. Compl. ¶¶ 6.6, 6.8. To the contrary, the Article specifically notes that Bryant has not been indicted. Ex. 1 (Dkt. 1-2) at 18-19.

The other statements fare no better. For example, Bryant denies he "conspired with Favre" (Compl. ¶ 6.27), was "approving or directing funding for the [volleyball facility] project" (*id.* ¶ 6.29), and/or was "direct[ing] MDHS to fund projects or instruct[ing] Favre on crafting a proposal that MDHS would approve" (*id.* ¶ 6.33); however, none of those phrases appear in the language from the Article quoted by the Complaint. *See id.* ¶¶ 6.26, 6.30, 6.32; *see also, supra,* Chart at II.B.  A valid defamation claim must be based on published statements. Governor Bryant cannot spin words in the

Article and allege that they mean or imply something different than what they actually say. The claims as to Sections I, II, IV, VIII, X, and XI, XII, and XVI must be dismissed.

c.    <em>The Statements in the Article are Substantially True</em>

The three (3) statements in the Article set forth in Sections XII, XVI, and XVII are, as a matter of law, not defamatory because they are substantially true on the face of the Complaint. It is axiomatic that the truth is an absolute defense to any defamation claim. *Cromwell v. Williams*, 333 So. 3d 877, 889 n.3 (Miss. Ct. App. 2022). A defamation plaintiff bears the burden of proving falsity, meaning they must allege sufficient facts from which the Court can infer that the complained of statement is untrue at the pleading stage; in other words, he must plead "facts that contradict or otherwise undermine the allegedly defamatory statement." *Trout Point Lodge Ltd. v. Handshoe*, 2012 WL 12884834, at *6 (S.D. Miss. Dec. 19, 2012). A statement is considered truthful if it is "substantially true." *Trust Point Lodge Ltd. v. Handshoe*, 729 F.3d 481, 490 (5th Cir. 2013). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Jones v. Browning*, 2020 WL 265210, at *6 (S.D. Miss. Jan. 17, 2020).

Here, Governor Bryant challenges statements that indicated he would accept stock in Prevacus. Compl. at ¶¶ 6.34-6.35, 6.42-6.44. The statements actually published are based on text message conversations in which Governor Bryant was either a sender or recipient and are quoted in the Article. For example, the Article cites the following conversation: "Two days after Bryant became a private citizen again, Prevacus CEO Jake VanLandingham texted him, offering stock. VanLandingham described it as 'a company package for all your help.' Bryant wrote back: 'Sounds good. Where would be the best place to meet? I am now going to get on it hard.'" Ex. 1 at 37. That text exchange confirms Governor Bryant was offered stock in Prevacus and would accept it.

Similarly, the Governor's assurances to Favre concerning the USM volleyball facility arise from text conversations involving Governor Bryant that are quoted in the Article:

20

- Text from Governor Bryant to Favre: "Of course I am all in on the Volleyball facility." Compl. at ¶ 6.9.

- "[F]avre texted Bryant: 'It's 3d and long and we need you to make it happen!!' Bryant wrote back: 'I will open a hole.'" Ex. 1 (Dkt. 1-1) at 17.

- (Quoting calendar invite from Davis): A meeting was requested by Brett Farve [*sic*] and the Governor to discuss . . . the new facility at USM." *Id.*

- "Favre wrote to Bryant: 'I was informed today that [New] may not be able to fund her part. I and we need your help very badly governor and sorry to even bring this up.' . . . Bryant texted him: "I will handle that . . . long story short but had to make a change. But I will call Nancy and see what it will take.'"). Ex. 1 (Dkt. 1-2) at 3.

- Governor Bryant to Favre: "We are working in it for sure." Ex. 1 (Dkt. 1-2) at 13.

- Governor Bryant to Chris Freeze: "Brett Farve [*sic*] keeps asking about the project . . . I am a supporter and I think it can be a big help to a lot of people." *Id.*

Governor Bryant does not allege that any of these text messages are inaccurate or fabricated. He simply denied their truth without any factual basis for such denials. That is insufficient. Thus, the Court can and should accept the statements as at least "substantially true."

Governor Bryant also challenges the Article's statement that "Bryant's lawyers have argued in a court filing that New and Davis embezzled MDHS funds 'unbeknownst to Bryant.'" Compl. ¶ 6.45. Specifically, his counsel deny having made that statement. *Id.* ¶ 6.46. Governor Bryant's September 23, 2022 Opposition to MCEC's Motion to Compel Governor Bryant to Produce Documents Responsive to Subpoena Duces Tecum confirms the Article's accuracy. *Miss. Dept. of Human Services vs. Miss. Commn'c. Educ. Ctr., Inc., et al.*, Case No. 22-cv-286-EFP (Hinds Cty. Cir. Ct.), Dkt. No. 140, at 10 ("II. Meanwhile, unbeknownst to Governor Bryant, New and Favre were pursuing MDHS funds for the USM Volleyball Center.")[3]  The statement is not actionable.

These three substantially true statements cannot stand as the basis for a defamation claim.

3.      *Governor Bryant Has Not Alleged a Non-Privileged Communication*

_____

[3] *See also id.* at 12 ("New did not tell Governor Bryant that she and Davis had arranged to contribute $4 million in TANF funds to the project."); *id*. at 18 ("Governor Bryant and Favre did not discuss the use of public funds for this project."); *id*. at 19 ("Governor Bryant had no knowledge of or involvement with the beach volleyball project."); *id*. at 24 ("Governor Bryant did not know what had previously transpired between New, Davis, and Favre regarding the funding of the USM Volleyball Center.").

Governor Bryant's defamation claim must also fail because the Article is protected by the fair reporting privilege. That privilege broadly protects fair and accurate media accounts and applies where the statements "are attributable to an official document or proceeding." *Pittman v. Gannet River States Pub. Corp.*, 836 F. Supp. 377, 382 (S.D. Miss. 1993). The privilege arises out of the core principle that "[t]he interests of society require that immunity should be granted to the discussion of public affairs and that all acts and matters of a public nature may be freely discussed and published with fitting comments and strictures." *Edmonds v. Delta Democrat Pub. Co*., 93 So. 2d 171, 173 (Miss. 1957). As the Mississippi Supreme Court explained in *Edmonds*:

> When a person comes prominently forward in any way and becomes a public or quasi-public figure, he invites free expression of public opinion, including criticism. When such criticism is in the form of an opinion, relates to public assertions or acts rather than to the individual in his private affairs, is fair in the sense that the reader can understand the factual basis for the opinions containing the criticism, and the publication relates to a matter of public interest, then the occasion is conditionally privileged; and no action will lie for such publication no matter how severe the criticism or unfavorable the comments, if the privilege is not abused.

93 So. 2d at 173-74. Applying that standard, the *Edmonds* court considered an article about an upcoming liquor law referendum that indicated that the plaintiff—an attorney and Executive Secretary of the United Dry Association of Mississippi—had made a "distortion of fact" as part of the organization's effort to keep the state dry. The plaintiff alleged that was libelous because it implied that he "was a person given to lying without regard to the truth and not to be trusted." *Id*. at 172. The court dismissed the claim, finding that the privilege applied because the article was fair comment that was not actionable. Specifically, the court held that the statement could not be actionable because it gave the reader the factual basis for the critical comments and criticism in the form of an opinion regarding a matter of public concern. *Id*. at 174. The same is true here.

Courts have routinely held that the fair comment or fair reporting privilege precludes a finding of defamation where an article or editorial, considered in context, makes clear it is drawing

from public documents or proceedings. For example, in *Pittman*, the court granted summary judgment for a newspaper that reported the plaintiff was involved in a prostitution ring based on the article's reliance on court documents. *Pittman v. Gannet River States Pub. Corp.*, 836 F. Supp. 377, 382 (S.D. Miss. 1993).  In *Hegwood*, the court granted summary judgment on a defamation claim where the statements in an article were based on a press release from the Sherriff's Office. *Hegwood v. Community First Holdings, Inc.*, 546 F. Supp. 2d 363, 367 (S.D. Miss. 2008). And in *McDonald*, the court granted summary judgment on a defamation claim based on a news station's publication of a rape suspect's photo because the allegation was based on information released by the police. *McDonald v. Raycom TV Broadcasting*, 665 F. Supp. 2d 688, 690 (S.D. Miss. 2009).

Here, the Article similarly draws on public records and official proceedings. Specifically, the Article introduces its foundation as including "an analysis of legal filings and records." Compl. Ex. 1 at 3 (emphasis added). The Article confirms that Governor Bryant's text messages were released as part of an ongoing lawsuit (*id*. at 43), and discusses multiple civil and criminal litigation cases, subpoenas, pleadings, and plea deals that are all part of the public court record. *See, e.g., id.* at 41-45. Because the Article is based on official proceedings and provides the factual basis for any criticism or commentary, the Article is protected under the fair comment privilege and the defamation claim should be dismissed.

### B.      Governor Bryant Fails to State a Claim for False Light

Governor Bryant's false light claim should be dismissed because that count rises and falls with Governor Bryant's defamation claim.  *Hays v. LaForge*, 333 So.3d 595, 608 (Miss. App. 2022) (affirming summary judgment on false light claim where defamation claim dismissed for lack of actual malice and finding that statements were not false and defamatory); *see also Cook v. Mardi Gras Casino Corp.*, 697 So.2d 378, 382-83 (recognizing failure to show defendant "acted in reckless disregard of any falsity" would preclude false light claim). Because Governor Bryant has not

adequately alleged defamation, he has not adequately alleged false light. The claims are based on the same factual predicates, are subject to the same standard, and therefore are pled with the same fatal flaws. For the reasons stated in Section IV.A, Count 2 must be dismissed.

**C.      Deborah Bryant Fails to State Claim for Loss of Consortium**

The Court should dismiss Deborah Bryant's loss of consortium claim because she has not offered a single factual allegation that would give rise to a plausible claim for relief. It is well-established that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. But that is all that is offered in support of Ms. Bryant's loss of consortium claim.

Ms. Bryant's loss of consortium claim consists of three allegations: (1) an incorporation of the preceding factual allegations by reference—none of which address the former First Lady's experience, relationship, or alleged injury; (2) a recitation of the elements of a loss of consortium claim; and (3) an allegation that "[t]he defendants have caused Deborah Bryant to suffer recoverable losses of consortium." Compl. ¶¶ 9.1-9.3. That is not enough. Ms. Bryant's threadbare recital of the elements is not sufficient to state a claim, and Count 3 should be dismissed.

**V.      CONCLUSION**

For the foregoing reasons, The Arena Group Holdings Inc. respectfully requests dismissal of all claims asserted by Plaintiffs Phil Bryant and Deborah Bryant for failure to state a claim upon which relief can be granted.

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

*/s/ Susan E. Egeland*
Susan Egeland (Lead Counsel)
MS Bar No. 104110
2323 Ross Avenue, Suite 1700
Dallas, Texas 75201
susan.egeland@faegredrinker.com
(469) 357-2500

Paul Rosenthal (*pro hac vice* forthcoming)
600 Campus Drive
Florham Park, NJ 07932
paul.rosenthal@faegredrinker.com
(973) 549-7300

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, I electronically filed the foregoing with the Clerk of

Court using the ECF System which sent notification of such filing to the following:

William M. Quin , II
MCCRANEY MONTAGNET & QUIN, PLLC
602 Steed Road, Suite 200
Ridgeland, MS 39157
601/707-5725
Fax: 601/510-2939
Email: wquin@mmqnlaw.com

*/s/ Susan E. Egeland*
SUSAN E. EGELAND