**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**PHIL BRYANT & DEBORAH BRYANT**                               **PLAINTIFFS**

**VS.**                        **CIVIL ACTION NO.: 3:24-cv-260-KJH-MTP**

**MICHAEL ROSENBERG &
THE ARENA GROUP HOLDINGS, INC.**                        **DEFENDANTS**

### DEFENDANT MICHAEL ROSENBERG'S REPLY BRIEF
### IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

Mississippi Governor Phil Bryant ("Gov. Bryant"), and his wife, former Mississippi First Lady Deborah Bryant ("Mrs. Bryant") (collectively "Plaintiffs"), responded in opposition to the pending Motions to Dismiss on July 23, 2024. The Memorandum Brief in Support of the Response ("Plaintiffs' Brief") (Doc. 13) seeks to convince this Court that the article at issue, "The Driving Force: How Brett Favre's Demands for Cash Fueled a Scandal" (the "Article") (Doc. 1-1 and 2), contains "actionable" defamation. A detailed examination of the Plaintiffs' Brief, however, reveals that the Plaintiffs, in an effort to avoid dismissal, have mischaracterized the Article's content. To put it simply: the Article does not say what the Plaintiffs claim it says.

The Defendant, Michael Rosenberg ("Rosenberg"), therefore requests that the Plaintiffs' Complaint be dismissed pursuant to Rule 12 (b) (6) of the *Federal Rules of Civil Procedure.*

Rosenberg also adopts and incorporates into this Reply the arguments set forth in Defendant The Arena Group Holdings, Inc.'s ("Arena Group") Reply Brief. (Doc. 17)

## ARGUMENT

The Arena Group's Reply Brief succinctly lays out the reasons why the Plaintiffs' Complaint should be dismissed: Gov. Bryant has failed to plead actual malice, Gov. Bryant has failed to allege "clear and unmistakable" false and defamatory statements, the Fair Reporting Privilege precludes Gov. Bryant's claims, and Mrs. Bryant has failed to plead loss of consortium. In the interests of efficiency, Rosenberg will not repeat all of the arguments contained in the Arena Group's Reply.

Rosenberg, however, does desire to emphasize the fact he has not written anything that could be construed as "clearly and unmistakenly" false.

### A.    The Plaintiffs have not adequately alleged falsity.

In order to survive the Motions to Dismiss, the Plaintiffs must show that the alleged defamation is "clear and unmistakable from the words themselves and not the products of innuendo, speculation, and conjecture." Favre v. Sharpe, 2023 U.S. Dist. LEXIS 193928, *9 (S. D. Miss. Oct. 30, 2023) (citing Ferguson v. Watkins, 448 So. 2d 271, 275 (Miss. 1984)). The Plaintiffs are incapable of meeting this burden.

The "Mississippi welfare scandal" involved a scheme to divert state welfare dollars ("TANF" payments) to the University of Southern Mississippi ("USM") for the construction of a volleyball facility.  The Article, which appeared in *Sports Illustrated*, focuses on Hall of Fame quarterback Brett Favre's ("Favre") role in the scandal. The Article details how Favre promised his alma matter, USM, that he would pay for USM to build a volleyball facility. As the Article states, "This is the story of what Favre did-and how he did it." (Doc. 1-1, page 5).

The Article explains that Favre did not want to honor his obligation to USM by using his own money. Instead, he asked state employees and contractors to basically pay his debt.  These

employees and contractors, such as John Davis and Nancy New, gave Favre what he wanted by diverting state money to him that was earmarked to help poor people.  These individuals have been indicted and some have pled guilty.

Now, based on the reporting of Anna Wolfe and *Mississippi Today* (for which they won a Pulitzer Prize), as well as the text messages which Rosenberg reviewed and cited in the Article, it is obviously a fact that Gov. Bryant involved himself with these shady characters in relation to the construction of the volleyball facility. However, the Article never states that Bryant did anything illegal or ordered someone else to do anything illegal.

As to some of the Plaintiffs' most tenuous assertions of falsity, Rosenberg responds as follows:

**1.      The Plaintiffs allege that the Article falsely suggests that federal prosecutors are building a case against Gov. Bryant.**

While it is true that the Article discusses the possibility of future indictments related to the welfare scandal, the Article does not state that a criminal case against Gov. Bryant is actively being built. The Article unequivocally states that federal prosecutors have refused to comment. (Doc. 1-2, page 19).

Should Gov. Bryant be worried that he may be indicted based on his clear involvement with some unsavory individuals? Definitely. As the saying goes, if you lie down with dogs you may end up with fleas. But this does not mean that Rosenberg has defamed him by explaining Gov. Bryant's role in the volleyball project.  If simply pointing out facts regarding an elected official's involvement with criminal defendants could be construed as defamatory, then the entire premise upon which *New York Times v. Sullivan* is based would be upended.  The public certainly has a right to know when their elected officials are involved with these types of individuals.

2.    **The Plaintiffs allege that the Article claims that Gov. Bryant illegally diverted welfare funds.**

The Article does no such thing. It only outlines various text exchanges which prove Gov. Bryant was involved in helping get the volleyball facility built.

For example, Rosenberg's examination of Favre's role begins with a text exchange between he and Gov. Bryant. Favre tells Gov. Bryant that he is trying to raise money for a volleyball facility and needs his influence to help with sponsorships or donations. Gov. Bryant replies that he is "all in" on the project and that he knows how to raise money. (Doc 1-1, page 6).

At this point, based on the text exchange, it is clear that Gov. Bryant and Favre agreed to work together to raise money for the facility.

The Article then states that on the advice of the USM athletic director, Favre contacted Nancy New, a fellow USM alumni who was on the USM Athletic Foundation board. During Gov. Bryant's tenure as Governor, Mississippi subcontracted the distribution of millions of dollars in welfare money to an organization run by New. (Doc. 1-1, page 7). New was able to grow her organization substantially as a result. The individual who determined how much money her organization got to distribute was John Davis ("Davis"), the head of the Mississippi Department of Human Resources ("DHS") (Doc. 1-1, page 8). Gov. Bryant does not deny that these statements in the Article are true.

On July 24, 2017, Favre, Davis, New, and others went on a tour of USM. According to court documents reviewed by Rosenberg, it was at this time that Davis promised that $4 million in funding would come from welfare funds (Doc. 1-1 page 10). However, the Article contains a specific denial from Gov. Bryant that he had knowledge of the meeting or the commitment of $4

million. (Doc. 1-1, page 10). As this Court can see, Rosenberg does not claim that Gov. Bryant illegally diverted welfare funds.

**3.      The Plaintiffs contend that the Article accuses Gov. Bryant of specific illegal acts.**

The Article does not accuse Gov. Bryant of doing anything illegal.  The Article only outlines actions and communications involving Gov. Bryant related to his effort to help Favre get the volleyball facility built. Like it or not, Gov. Bryant obviously chose to involve himself in Favre's project.  While his actions certainly deserve scrutiny, the Article does not accuse him of specific illegal acts.

For example, the Article describes efforts by Favre to obtain additional money for the volleyball project after the initial distributions from New. It quotes a text exchange between Favre and Gov. Bryant. In the text exchange, Gov. Bryant offers to pay for some construction work himself on the project and he also offers to do a fundraiser in Hattiesburg to "support the project." (Doc. 1-1, page 15). ***The Article expressly states that this offer by Gov. Bryant was legal.***  Id.

The Article also correctly points out that Bryant, Davis, New, and Favre were all working together to help fund the volleyball project. The Article quotes specific text messages, which reveal that Gov. Bryant played a major role in getting this "team" together. The Article does not state that Bryant's role was illegal, however.

The Article also points out that a routine audit of DHS finances discovered a questionable payment to one of Davis's associates that was sent to a P.O. Box owned by Davis. As a result, the deputy director of DHS turned Davis in to Gov. Bryant. (Doc. 1-1, page 23). The Article then correctly points out that Gov. Bryant had no other choice but to alert the State Auditor, Shad

White. Id. These are completely true statements in every respect, which Gov. Bryant does not deny.

**4.     The Plaintiffs claim that the Article falsely accuses Gov. Bryant of manipulating communications in an effort to appear innocent.**

The Article does not specifically accuse Bryant of tampering with evidence or communications. What it does do is compare the texts Gov. Bryant sent to Favre prior to the State Auditors investigation, with texts Gov. Bryant sent Favre after the State Auditor's office got involved. A simple review of the texts post Davis's resignation shows that Gov. Bryant was extremely cautious about what he chose to say.

For example, the Article states:

On July 22, 2019—just two weeks after Davis announced his "retirement"—Favre texted Bryant:

"Governor this Friday Deion Sanders and his son are coming for a recruiting visit. He is a QB and could be best in country. I already with Nancy started talking about a indoor facility but I think we have got to get one to stay up with everyone else. But it won't happen anytime soon if you and Nancy can't help. I would like to tell him we are about to start building in the next year and half."

The request was brazen and revealing. Bryant was a Southern Miss alum, capable of legally raising money for the football program, but the reference to "you and Nancy" was a pretty clear request for government money. Favre even applied time pressure on the governor.

Bryant knew a legal land mine when he saw one. His response read like it could have been written by—or for—a lawyer:

"The State Auditor is reviewing all the Contracts at DHS which Funds Families First. Hope we get legal clearance soon. Don't want to get anyone in trouble for improper expenditures. Should know soon."

Favre kept pushing: "As far as families first and facilities goes I think we can do so much together. It would be beneficial for both."

Bryant, formally again: "Hope we get clearance."

Favre, pushing again: "What's your gut tell you will happen? I have to come up with a lot of money if this doesn't get clearance."

Bryant, formally again: "It's the State Auditor that will give the approval. Has to have legal authority. I will check today."

Favre, pushing *again*: "if I need to do anything to help make this all work please let me know."

Bryant: "Will do.. we are checking today. Thanks for caring."

On July 28, Favre sent Bryant another lengthy text about the Sanders family and Southern Miss. Once again, Bryant skipped any promises or turkey-hunting banter and responded with a text only a lawyer could love:

"Nancy has some limited control over Federal Funds in the form of Grants for Children and adults in the Low Income Community. Use of these funds are tightly controlled. Any improper use could result in violation of Federal Law. Auditors are currently reviewing the use of these funds by Families First. As soon as the Audit is completed we will know if the project at USM is a proper expenditure. Neither I nor Nancy can make this decision. She must have approval from DHS and the State Auditor. As soon as we get approval we can move forward. Without that approval any expenditure could be illegal and Nancy and USM could be made to repay the Federal Government any and all funds spent. That's why we are waiting till it is approved."

(Doc. 1-2, pages 4-6)

It is undisputed that at this point Gov. Bryant knew that investigators were probing Davis's crimes, since he was the one who turned Davis in to the State Auditor's office. As a result, he is much more cautious and formal in his texts. This is in stark contrast to his earlier texts with Favre, wherein he talks about his fund-raising prowess, his ability to "open holes," and his references to he, Favre, New, and Davis being on the "same team."  Rosenberg's descriptions of Gov. Bryant's own words as cautious, formal, and legalistic are completely

reasonable and well within his rights as a reporter. As such, this part of the Article cannot constitute defamation.

     5.     **The Plaintiffs argue that the Article falsely implies a quid pro quo arrangement involving Gov. Bryant agreeing to accept stock in Prevacus.**

The Article does discuss VanLandingham's stock offer, but it does not state that Gov. Bryant accepted the offer of stock in exchange for his efforts to help construct the volleyball facility or for any actions to help VanLandingham.

The Article mentions Prevacus, a pharmaceutical company that was developing a drug that would treat concussions. The Article states that Prevacus' largest outside investor is Favre. (Doc. 1-1, page 16). On December 6, 2018, Prevacus CEO Jake VanLandingham[1] texted Gov. Bryant telling him that we want "you on the team and we can offer stock." Id. However, the Article never states that Gov. Bryant agreed to accept the stock at that point.

Apparently however, VanLandingham was able to schedule a dinner with Gov. Bryant and others, including Joseph Canizaro, a longtime doner to Mississippi Republicans and a real estate developer on the Mississippi Gulf Coast. Id. Canizaro was in the process of building a campus for pharmaceutical companies.  The Article states that Gov. Bryant would later be listed as Vice President of two of Canizaro's companies after he left office. Id. at 17. Gov. Bryant does not deny this.

After the dinner, Favre texted Bryant that "It's 3rd and long and we need you to make it happen!" Gov. Bryant responded: "I will open a hole." Id.

The next day, Favre told VanLandingham to talk to New. Then, Davis sent out a calendar invite for a meeting he claimed was requested by Favre and Gov. Bryant. The topic of the meeting

---

[1] VanLandingham has now pleaded guilty to wire fraud in connection with the welfare scandal.

according to Davis would be to discuss a research program to address concussion injuries and to discuss the new facility at USM. <u>Id.</u>

This meeting took place at Favre's home. <u>Id.</u> at 19. The Article states that Gov. Bryant was not at the meeting. <u>Id.</u> However, he did send a text prior to the meeting stating that an acquaintance of his might be willing to "help our cause." <u>Id.</u> Gov. Bryant does not dispute this.

During the meeting, New agreed to send Prevacus $1.7 million in TANF money. <u>Id.</u> Later that same night, Favre texted Gov. Bryant that VanLandingham wanted to follow up with Canizaro, and Gov. Bryant replied "Sure." <u>Id.</u>

New then ended up sending approximately $2.2 million dollars to Prevacus. <u>Id.</u> at 20. The Article states:

> VanLandingham and Favre had their cash infusion; Bryant's ally, Canizaro, had the inside track on a real estate deal; and Bryant had VanLandingham dangling company stock for him.

<u>Id.</u>

This statement is of course absolutely, 100% true. Do Gov. Bryant's actions seem suspicious? Certainly. But again, the Article does not accuse Bryant of doing anything illegal. The Article just correctly lays out the facts based on Gov. Bryant's own words.

## **<u>CONCLUSION</u>**

For the above reasons, and for the reasons set forth in Arena Group's Reply Brief, Rosenberg respectfully requests that this Court dismiss this case pursuant to Rule 12 (b) (6) of the *Federal Rules of Civil Procedure* with prejudice. Rosenberg also prays for any other relief he may be entitled to under the circumstances.

Respectfully submitted, this the 6th day of August, 2024

CLAYTON O'DONNELL, PLLC

P.O. Drawer 676
Oxford, MS  38655
Telephone:  (662) 234-0900

s/ S. Ray Hill, III
S. RAY HILL, III, MSB# 100088
rhill@claytonodonnell.com


## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notice to all counsel of record.

s/  S. Ray Hill, III
S. RAY HILL, III, MSB# 100088