UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PHIL BRYANT, ET AL.                                          PLAINTIFFS

V.                              CIVIL ACTION NO. 3:24-CV-260-KHJ-MTP

MICHAEL ROSENBERG, ET AL.                                    DEFENDANTS

ORDER

Before the Court are Defendants The Arena Group Holdings, Inc. and

Michael Rosenberg's [4, 9] Motions to Dismiss. *See also* Rosenberg's Joinder in

Arena's Mot. Dismiss [11]. The Court grants both motions and denies leave to

amend the [1] Complaint. It thus dismisses Plaintiffs Phil and Deborah Bryant's

claims with prejudice.

I.    Background

This is a defamation case about a Sports Illustrated (SI) article that allegedly

accuses former Mississippi governor Phil Bryant of involvement in a conspiracy to

misuse state welfare funds. [1] ¶¶ 1.1–.2. In May 2023, SI published an article by

senior writer Michael Rosenberg titled "'The Driving Force': How Brett Favre's

Demands for Cash Fueled a Scandal." *Id.* ¶ 1.1; *see also* Article [1-1]; Article [1-2].

The article "set out to explain and examine [former NFL quarterback Brett] Favre's

role" in a scandal that saw millions of state welfare dollars diverted to fund a new

volleyball facility at the University of Southern Mississippi (USM) and invest in a

pharmaceutical company called Prevacus. *See* [1-1] at 5, 9–10, 19; *see also Favre v.*

*Sharpe*, 117 F.4th 342, 344–45 (5th Cir. 2024) (detailing the scandal), *aff'g* No. 2:23-CV-42, 2023 WL 7132949, at *1–2 (S.D. Miss. Oct. 30, 2023) (same).

Rosenberg's article set the stage by outlining Mississippi's welfare distribution system. *See* [1-1] at 7–9. Former Mississippi Department of Human Services (MDHS) executive director John Davis oversaw the federally funded Temporary Assistance for Needy Families (TANF) welfare program in Mississippi. *See id.* at 2, 7–8; [1] ¶ 1.2. Under Bryant's governorship, Mississippi subcontracted the distribution of welfare funds to outside organizations. [1-1] at 7. One of those organizations was the nonprofit Mississippi Community Education Center (MCEC), which was run by its then executive director Nancy New. *Id.*; [1] ¶ 1.2. MCEC would apply to MDHS for welfare funds and then distribute the money to a range of programs. [1-1] at 7–8. Put differently, Davis received welfare grants from the federal government, and New received a portion of those grants from Davis to distribute them. *See id.* at 7–9.

Against that backdrop, Rosenberg constructed an account of the scandal using court documents, text messages, interviews, and prior reporting. *See id.* at 1–23; [1-2]. Rosenberg's narrative began in April 2017 when Favre texted Bryant to ask for help with raising money to build a new volleyball facility at USM. *See* [1-1] at 6. Later in July, USM's athletic director met with Davis and New, among others. *Id.* at 7, 9. At that meeting, Davis promised $4 million to the USM Athletic Foundation for the volleyball facility. *See id.* at 9–11. New then gave that money to USM through MCEC using TANF funds. *Id.* at 10–14. The article notes that Bryant

denied any knowledge of Davis's meeting with USM or the commitment of $4 million for the volleyball facility. *Id.* at 10. But Rosenberg also quotes a former MDHS employee opining that "[t]he head of [M]DHS doesn't make those decisions without the governor's knowledge and approval. That is just unfathomable to me." *Id.*

Over a year later, in December 2018, Bryant received a text from Jake VanLandingham—the CEO of Prevacus, a pharmaceutical company that Favre was invested in. *Id.* at 16. VanLandingham told Bryant, "[W]e want you on the team and can offer stock." *Id.* Not long after, Davis arranged a meeting at Favre's home between himself, New, Favre, VanLandingham, and several others. *Id.* at 17. Davis's invitation stated that Favre and Bryant had requested the meeting, and by the end of that gathering, New had "agreed to send $1.7 million in TANF money to Prevacus" through MCEC. *Id.* at 17, 19. Describing the meeting, Rosenberg states that Bryant "was not there, but his presence was felt." *Id.* at 19. And the article quotes a text message Bryant sent just before the meeting. *Id.* In it, Bryant tells VanLandingham that another potential investor "sounds like someone who can help our cause." *Id.*

About a year later (and two days after Bryant left office in January 2020), VanLandingham texted Bryant, "Now that you're unemployed[,] I'd like to give you a company package for all your help." Miss. Today Compl. [1-3] ¶ 6.250 (cleaned up); *see also* [1-2] at 14. Bryant responded, "Sounds good. . . . I am now going to get on it hard." [1-3] ¶ 6.250 (cleaned up). VanLandingham later stated publicly that Bryant

"was always straight up. There was never any stock exchanged. There was never any money exchanged. . . . We were probably working towards having the governor, post-governorship, help us . . . ." *Id.* ¶ 6.258 (cleaned up).

After an internal audit in mid-2019 turned up some financial irregularities at MDHS, Mississippi state auditor Shad White—"Bryant's former campaign manager and a Bryant appointee"—started investigating the agency. [1-1] at 23; [1-2] at 1; *see also* [1-3] ¶ 1.2. By early 2020, White had uncovered the scandal and arrested Davis, New, and several others involved. [1-3] ¶ 1.1. As White's audit of MDHS continued, the agency eventually hired an independent investigator, Brad Pigott, to track and recover the misspent funds. [1-1] at 4; [1-2] at 18; [1-3] ¶ 6.145.

In October 2021, White sat for an interview with Anna Wolfe, a *Mississippi Today* journalist covering the scandal.[1] During that interview, Wolfe suggested that Bryant directed Davis to give TANF money to USM and Prevacus. [1-3] ¶ 6.35. White denied having any "specific evidence" implicating Bryant but stated that "if there's any documented evidence . . . we need to make sure that we have it." *Id.* (cleaned up). He also added that Davis was still free to disclose any evidence he had against Bryant. *Id.* ¶ 6.37. Not long after the interview, texts between Bryant, Davis, Favre, and VanLandingham were leaked to Wolfe, who used them to write a set of articles in mid-2022 called "The Backchannel." *Id.* ¶¶ 1.11–.12, 6.67; Miss.

---

[1] *State Auditor Shad White Discusses Welfare Investigation, Former Gov. Phil Bryant*, Miss. Today (Apr. 12, 2022), https://mississippitoday.org/2022/04/12/shad-white-phil-bryant-welfare-scandal/ [https://perma.cc/S8Q9-UGZJ]; *see also* [1-3] ¶¶ 6.35–.41 (quoting Miss. Today, *supra*).

Today, *supra* note 1. Wolfe won a Pulitzer Prize in 2023 for that series. [1-3] ¶ 1.22; [1-1] at 5.

Bryant took his turn sitting for an interview with Wolfe in April 2022.[2] Throughout that exchange, Bryant denied any wrongdoing. *See* Wolfe, *supra* note 2. But he also knew the optics didn't look good:

> [Wolfe:]  I mean, this is really serious. It appears as if you've helped this company along in your last year in office—
> Bryant:  I understand, I understand.
> [Wolfe:]  —and then answered affirmatively when asked about taking stock.
> Bryant:  Yeah.

*Id.* For example, Bryant acknowledged that he "know[s] . . . it looks" like he knew that public funds went to Prevacus. *Id.* Indeed, Bryant added, "I can clearly see why you're following those trails. And it doesn't look good. Should I have caught it? Absolutely. I should've caught it." *Id.*[3]

Two months later, Pigott subpoenaed communications between Bryant and USM. [1-2] at 18. But Pigott's probe was short-lived: Mississippi governor Tate Reeves—Bryant's successor—fired Pigott shortly after. *Id.* While Pigott accused

---

[2] Anna Wolfe, *Q&A with Former Gov. Phil Bryant About Prevacus, Welfare Scandal*, Miss. Today (Apr. 4, 2022), https://mississippitoday.org/2022/04/04/phil-bryant-brett-favre-prevacus-welfare-scandal/ [https://perma.cc/9WLJ-6JG9]; *see also* [1-3] ¶¶ 6.52–.62 (quoting Wolfe, *supra*).

[3] *See also, e.g.*, Wolfe, *supra* note 2 ("I know that's hard to believe and I know people will read it and say, 'Well, of course he knew.' But I'm telling you, I just did not realize the details within those texts."); *id.* ("Again, I probably [was] wrong in doing it, but my standard reply was that very positive response—'good,' 'great'—but I did not thoroughly process that. And I should have caught it."); *id.* ("I was texted, and I assume in today's world, we have to say that's undeniable evidence. But I did not carefully review those texts. And so it simply got by me. That's all I can tell you."); *id.* ("I just absolutely missed it. That's all I can tell you.").

Governor Reeves of firing him for looking into Bryant and USM's roles in the scandal, the governor shot back that Pigott "had a 'political agenda' and wanted to be in the media spotlight." [1-3] ¶¶ 6.146–.147 (cleaned up). For his part, White expressed that "[f]iring Pigott [was] a mistake." [1-2] at 18. As the state investigation stalled, federal authorities were also carrying on their own investigation into the scandal, and they "declined to comment on any aspect of the case." *Id.* at 19.

Around a year after Rosenberg published his article, the Bryants sued Arena and Rosenberg—the article's publisher—seeking damages and injunctive relief for defamation, false light, and loss of consortium. [1] ¶¶ 7.1–11.3. They allege that Rosenberg's article "repackages similarly defamatory statements published" in Wolfe's Pulitzer Prize-winning articles on the welfare scandal. *Id.* ¶ 1.3. The Bryants oppose various statements in Rosenberg's article asserting or implying that Bryant participated in the welfare scandal. *Id.* ¶¶ 6.1–.46. And they complain that Rosenberg (1) "disregarded a mountain of objective evidence"; (2) "opted to believe [New,] a disgraced felon with an axe to grind and uncorroborated stories to tell"; (3) ignored the "conclusions of every . . . investigator who has reviewed the case"; and (4) presented "no competent evidence that . . . Bryant did anything corrupt or illegal." *Id.* ¶¶ 6.24–.25. Arena and Rosenberg now move to dismiss, arguing that the Bryants have failed to state a valid defamation, false-light, or loss-of-consortium claim. *See* Arena's Mem. Supp. Mot. Dismiss [5] at 11–24.

II.    Standard

Federal Rule of Civil Procedure 12(b)(6) permits the dismissal of a complaint if it fails "to state a claim upon which relief can be granted." When reviewing a complaint under Rule 12(b)(6), the Court only considers the complaint, documents attached to or incorporated in it, and matters subject to judicial notice. *Benfer v. City of Baytown*, 120 F.4th 1272, 1278 n.2 (5th Cir. 2024). The Court must accept all factual allegations in the complaint as true, but it is not bound to accept legal conclusions, conclusory statements, or bare assertions without factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And if a complaint's exhibits contradict its allegations, the exhibits control. *Stevenson v. Tocé*, 113 F.4th 494, 502–03 (5th Cir. 2024). To survive a motion to dismiss, a complaint must include enough factual allegations to state a facially plausible claim to relief. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility if the Court may reasonably infer the defendant's culpability from the facts the plaintiff alleges. *Id.*

If a complaint fails to satisfy Rule 12(b)(6), courts should liberally grant leave to amend "when the plaintiff might be able to state a claim based on the underlying facts and circumstances." *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 394 (5th Cir. 2024) (cleaned up). But if amendment would be futile, a Rule 12(b)(6) dismissal should be with prejudice. *See HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 345–46 (5th Cir. 2021); *see also Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986) ("At some point a court must decide

that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit.").

III.    Analysis

Bryant fails to plausibly allege that Arena or Rosenberg acted with actual malice, which is required to maintain his defamation claim. His false-light claim, Mrs. Bryant's loss-of-consortium claim, and the Bryants' joint respondeat superior and injunctive claims each fall alongside the defamation claim. Furthermore, the Court denies the Bryants leave to amend as futile. Thus, the Court dismisses the Bryants claims against Arena and Rosenberg with prejudice.

A.  Defamation

Bryant fails to state a defamation claim against Arena or Rosenberg. Bryant is a public figure. *See* [1] ¶ 7.2. So he must plausibly allege four elements: (1) a false and defamatory statement, (2) unprivileged publication, (3) actual malice, and (4) special harm (or actionability regardless of special harm). *Simmons L. Grp., P.A. v. Corp. Mgmt., Inc.*, 42 So. 3d 511, 517 (Miss. 2010); *see also Palmquist v. Hain Celestial Grp., Inc.*, 103 F.4th 294, 306 (5th Cir. 2024) ("[F]ederal courts sitting in diversity apply state substantive law." (cleaned up)). The parties dispute the first three elements. *See* [5] at 16. But the Court's analysis begins and ends with actual malice. *See Favre*, 117 F.4th at 346 (limiting analysis to "clearest ground on which to rule"). Bryant does not plausibly plead actual malice, so the Court dismisses his defamation claim.

8

The First Amendment "protects authors and journalists who write about public figures by requiring a plaintiff to prove that the defamatory statements were made with . . . 'actual malice.'" *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991). In the First Amendment context, actual malice refers to the "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511. While actual malice "may be alleged generally," Fed. R. Civ. P. 9(b), it must still be alleged plausibly. *Iqbal*, 556 U.S. at 686–87; *see also Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 744–45 (5th Cir. 2019); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (collecting cases).

The standard is subjective. *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997). Establishing reckless disregard requires showing that "the defendant actually had a high degree of awareness of probable falsity," or "in fact entertained serious doubts as to the truth of his publication." *Id.* (cleaned up). So it is not enough to show even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) (cleaned up); *see also, e.g., J. Publ'g Co. v. McCullough*, 743 So. 2d 352, 365 (Miss. 1999).

At the same time, sufficient "indirect or circumstantial evidence" can establish actual malice. *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070 (5th Cir. 1987). "The Supreme Court has stated in dicta that reckless disregard could be found where, for example, a reporter fabricated a story out of his

imagination, based it on an 'unverified anonymous telephone call,' published 'inherently improbable' statements, or had 'obvious reasons to doubt the veracity of the informant.'" *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

Bryant fails to plausibly allege actual malice. Taken cumulatively, Bryant's allegations do not allow the Court to reasonably infer that Rosenberg published the article with "knowledge of falsity or reckless disregard as to truth or falsity." *Masson*, 501 U.S. at 511. The Court considers the [1] Complaint's actual-malice allegations in turn.

### 1. Disregarding Objective Evidence

The [1] Complaint first alleges that Rosenberg "disregarded a mountain of objective evidence" proving Bryant's innocence. [1] ¶ 6.24. For two reasons, that allegation does not contribute to a showing of actual malice. First, it is conclusory. And second, Bryant's response, which tries to shore up the allegation, only undercuts it.

To begin, the allegation is conclusory. Mere "conclusory statements" and "naked assertions devoid of further factual enhancement" are insufficient. *Iqbal*, 556 U.S. at 678 (cleaned up). So Bryant cannot simply assert that Rosenberg disregarded "objective evidence" (much less a mountain's worth). [1] ¶ 6.24. Rather, Bryant must plead "factual content" supporting his assertion. *Benfer*, 120 F.4th at 1279. He fails to do so.[4]

---

[4] To be sure, Bryant attached his 200-page state-court complaint as an exhibit. *See* [1-3]. All the same, plaintiffs may not simply "attach lengthy exhibits to their complaints in the hope of making otherwise deficient pleadings sufficient under Rule 12(b)(6)." *In re Life*

The Court could stop there. But Bryant's response tries to buttress the allegation, arguing that Rosenberg published his story despite (1) White's October 2021 interview in which he (purportedly) said there is "no evidence" of Bryant's wrongdoing, (2) VanLandingham's public statement, and (3) Bryant's "denials of wrongdoing in a detailed interview and public statements." Bryants' Mem. Supp. Resp. [13] at 36, 38 (cleaned up). The response's arguments tend to negate, not support, a plausible showing of actual malice.

For starters, the article's failure to cite White's October 2021 interview does not indicate actual malice. Bryant's contrary argument rests on a false premise: that White said in the interview with Wolfe that there was "no evidence" of Bryant's wrongdoing. *Id.* at 36 (citing [1-3] ¶¶ 6.35–.41). White did not say that. Instead, White said that "if there's any documented evidence . . . we need to make sure that we have it." [1-3] ¶ 6.35 (cleaned up). He then noted that Davis was "still free" to disclose any evidence he had against Bryant. *Id.* ¶ 6.37 (cleaned up).

So Rosenberg's decision not to include the October 2021 interview—which happened before nearly all the evidence underlying Rosenberg's piece was publicly released, *see id.* ¶ 1.11—does not indicate actual malice. *See Talley v. Time, Inc.*, 923 F.3d 878, 905–06 (10th Cir. 2019) ("[T]he author of an article will have to choose which facts to include and which to omit, because it is impossible to print all of the facts on which an opinion or belief is based, especially when an article

---

*Partners Holdings, Inc.*, 926 F.3d 103, 117 n.6 (5th Cir. 2019). Bryant's [1] Complaint never referenced *any* particular factual content within the 200-page state-court complaint.

comprises a critical analysis." (cleaned up)). This is especially so because Rosenberg noted White's potential bias for Bryant: White was "Bryant's former campaign manager and a Bryant appointee" who had "been dogged by insinuations that he was protecting Bryant . . . ." [1-1] at 23; [1-2] at 18. Rosenberg also published White's later statement saying it was "a mistake" when Governor Reeves fired Pigott, the independent investigator who had subpoenaed the USM Athletic Foundation's communications with Bryant. *See* [1-2] at 18; *see also* [1-1] at 4; [1-3] ¶ 6.149. This statement implies that White may have thought it worthwhile to investigate any potential connections between Bryant and the welfare scandal.

Turning to VanLandingham's public statement, the article shows that Rosenberg accurately reported its substance. VanLandingham said that Bryant was "straight up" and never accepted any stock. *See* [13] at 33, 36 n.85; [1-3] ¶ 6.258 (cleaned up). Meanwhile, Rosenberg reported that—as a matter of fact—Bryant never accepted any stock. *See* [1-2] at 20. That offers no indication of actual malice. *See Jacoby v. Cable News Network, Inc.*, No. 21-12030, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021) (per curiam) (noting that reporters need not "credit [a defamation plaintiff's] preferred sources of information").

Finally, Rosenberg did specifically address Bryant's denials. [1-2] at 20–21; *see also Stevenson*, 113 F.4th at 502–03. In fact, Rosenberg quoted from the "public statements" that Bryant cites. *See* [13] at 38 & n.89 (citing [1-2] at 20–21). And Rosenberg quoted from—and twice hyperlinked to—the "detailed interview" that Bryant references. *See id.* at 38 & n.88; [1-2] at 20–21. Reporting the very evidence

that Bryant cites tends to negate a showing of actual malice. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1273–74 (11th Cir. 2018).

Perhaps Bryant means to argue that Rosenberg should have *credited* his denials. But "the press need not accept denials, however vehement." *Harte-Hanks*, 491 U.S. at 691 n.37 (cleaned up). Denials "in themselves . . . hardly alert the conscientious reporter to the likelihood of error." *Id.* (cleaned up). The substance of Bryant's denials illustrates that point: While denying wrongdoing, Bryant admitted that some of the evidence against him "doesn't look good" and that he knew people would "read it and say, 'Well, of course he knew.'" Wolfe, *supra* note 2; *see also supra* note 3. Of course, Bryant's denials still may have been objectively true. But actual malice is a subjective standard, so Bryant's admissions undermine a showing of actual malice.

At bottom, Bryant's mountain-of-objective-evidence allegation does not plausibly indicate that Rosenberg had a "high degree of awareness of probable falsity or . . . entertained serious doubts as to the truth of his publication." *Harte-Hanks*, 491 U.S. at 667 (cleaned up). And Bryant's response tends to undermine a plausible showing of actual malice.

2. Believing New

Bryant next alleges that Rosenberg "opted to believe" New, "a disgraced felon with an axe to grind and uncorroborated stories to tell." [1] ¶ 6.25; *see also id.* ¶ 6.24 ("Rosenberg relied on information provided to him by Nancy New or individuals aligned with her."). For four reasons, that allegation does not contribute to a

showing of actual malice. First, it is conclusory. Second, it is self-defeating. Third, the article contradicts it. And fourth, Bryant's response confirms that the argument lacks merit.

Again, the allegation itself is conclusory. *See Iqbal*, 556 U.S. at 678. Bryant says that Rosenberg relied on "uncorroborated stories" from New, [1] ¶ 6.25, but he offers no facts supporting that. Separately, the allegation is self-defeating. Because actual malice is a subjective standard, the "critical determination is whether [Rosenberg] in fact believed [New]." *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985). Yet Bryant concedes that Rosenberg "opted to believe" her. [1] ¶ 6.25. That negates a plausible showing of actual malice. Next, the article contradicts Bryant's allegation that Rosenberg published "uncorroborated stories" from someone "with an axe to grind." *Id.* In fact, Rosenberg relied on New's (and others') pre-indictment text exchanges, among many other sources. *See* [1-1]; [1-2].

Finally, Bryant's response confirms that his argument lacks merit. Bryant submits that relying on New, a "furious and biased source[,] proves actual malice." [13] at 39. But his own citation undercuts his argument:

> Many a criminal conviction has rested entirely on the testimony of co-conspirators despite the requirement in a criminal case of proof beyond a reasonable doubt; *a fortiori*, a broadcaster is entitled to repose confidence in a conspirator unless the circumstances create in the broadcaster's mind a belief that there is a high probability that the [alleged] conspirator is lying.

David Elder, *Defamation: A Lawyer's Guide* § 7:2 (Oct. 2023 update) (quoting *Desnick v. Am. Broad. Cos.*, 233 F.3d 514, 519 (7th Cir. 2000)); *see also* [13] at 39.

Bryant points to no such circumstances here—especially because the article disclosed grounds for doubting New. Rosenberg noted that New "pleaded guilty to four counts of bribing a public official, two counts of fraud against the government, [and] six counts of wire fraud and racketeering." [1-2] at 18; *see also id.* at 22. As Rosenberg put it: "Her reputation is shot." *Id.* at 18. The article's "full (or pretty full) publication of the grounds for doubting [New] tends to rebut a claim of malice, not to establish one." *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1304 (D.C. Cir. 1996); *see also Michel*, 816 F.3d at 703; *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) (en banc) ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest.").

As a result, Bryant's opted-to-believe-New allegation does not plausibly indicate that Rosenberg had a "high degree of awareness of probable falsity or . . . entertained serious doubts as to the truth of his publication." *Harte-Hanks*, 491 U.S. at 667 (cleaned up).

### 3. Ignoring Investigators' Conclusions

Bryant next alleges that Rosenberg ignored the "conclusions of every state and federal investigator who has reviewed the case." [1] ¶ 6.25. For three reasons, that allegation does not contribute to a showing of actual malice. First, it is conclusory. Second, the article contradicts it. And third, Bryant's response confirms that his argument lacks merit.

Here again, the allegation itself is conclusory. *See Iqbal*, 556 U.S. at 678. Bryant says that Rosenberg ignored investigators' "conclusions," [1] ¶ 6.25, but he offers no factual content about what those conclusions were. *Benfer*, 120 F.4th at 1279.

Separately, the article contradicts the conclusory allegation. *See Stevenson*, 113 F.4th at 502–03. Rosenberg's article accurately relayed that—as of May 2023—there were no conclusions to report. *See* [1-2] at 18–21. As for the state investigation, Rosenberg accurately reported that Governor Reeves fired Pigott after he subpoenaed the USM Athletic Foundation's communications with Bryant. *See id.* at 18; *see also* [1-1] at 4; [1-3] ¶ 6.149. Firing Pigott prevented him from reaching any conclusions about the nature of Bryant's involvement. And as for the federal investigation, Rosenberg accurately reported that the investigation was ongoing. [1-2] at 18. So Rosenberg explained, federal authorities "declined to comment on any aspect of the case." *Id.* at 19. A then-pending federal investigation into the TANF scandal tends to undercut, not support, a plausible showing of actual malice.

Finally, Bryant's response confirms that his argument lacks merit. The response changes tack: Rather than arguing that Rosenberg ignored conclusions, it submits that Rosenberg should have waited for those conclusions before publishing. *See* [13] at 40. In Bryant's telling, Rosenberg "should have allowed pending criminal and civil cases to conclude." *Id.* And while conceding that pending cases have not concluded, Bryant contradictorily argues that the idea of Rosenberg "uncover[ing]

crimes and corruption that the state and federal authorities failed to detect in years of detailed investigation is inherently improbable." *Id.* at 37. Of course, this argument assumes that the authorities detected nothing, but from Rosenberg's vantage, the state investigation was cut short while the federal investigation remained ongoing and confidential. *See* [1-2] at 18–19.

Ultimately, Bryant cites no authority suggesting that the free press must wait years for pending cases to resolve—or statutes of limitations to run—before writing a critical piece about the welfare scandal and Bryant's role in it. *But see, e.g.*, *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1251 (5th Cir. 1980) (discussing "nation's profound historical commitment to robust debate on political issues, especially press criticism of the stewardship of public officials"); Arena's Reply [17] at 5 (noting that, under Bryant's logic, "no news organization could report on any suspected public corruption in the face of denials from involved officials absent civil or criminal charge"). Rosenberg's failure to wait does not support a plausible showing of actual malice.

For those reasons, Bryant's ignoring-investigators'-conclusions allegation does not plausibly indicate that Rosenberg had a "high degree of awareness of probable falsity or . . . entertained serious doubts as to the truth of his publication." *Harte-Hanks*, 491 U.S. at 667 (cleaned up).

### 4.  Presenting no Competent Evidence

Bryant's final allegation is that "no competent evidence" supported Rosenberg's article. [1] ¶ 6.25. For three reasons, that allegation does not contribute

to a showing of actual malice. First, it is conclusory. Second, the article contradicts it. And third, Bryant's response confirms that the argument lacks merit.

Once again, the allegation itself is conclusory. *See Iqbal*, 556 U.S. at 678. Bryant says that Rosenberg lacked "competent evidence," [1] ¶ 6.25, but he offers no factual content as to why Rosenberg's evidence was not "competent." *Benfer*, 120 F.4th at 1279.

For the most part, Bryant argues that Rosenberg relied on "rootless speculation" and misstated the evidence. [13] at 36–38. But the article contradicts these contentions. *See Stevenson*, 113 F.4th at 502–03. The article shows that Rosenberg relied on court records, text messages (including texts that Bryant himself released via "Bryanttexts.com"), interviews, and Pulitzer Prize-winning reporting, among other sources. *See* [1-1]; [1-2]. This multiplicity of sources alone tends to negate a showing of actual malice. *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) (noting that actual malice "cannot be found where . . . the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied"); *see also Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020) ("[R]eliance on . . . many independent sources, alone, should defeat any claim of actual malice.").

Even so, Rosenberg did not rely on "rootless speculation." [13] at 37. Rosenberg printed that a former MDHS employee told him it was "just unfathomable to [her]" that Davis would promise $4 million to the USM Athletic Foundation without Bryant's knowledge or approval. [1-1] at 10. Notably,

Rosenberg did not accuse Bryant of ordering Davis to do anything. And while the former MDHS employee was speculating, that speculation was not entirely rootless given that she had worked in MDHS. *See id.* Bryant provides no facts indicating that Rosenberg had a "high degree of awareness" that this speculation was probably false. *Harte-Hanks*, 491 U.S. at 666 (cleaned up).

Finally, Bryant's response undercuts his argument that Rosenberg misstated the evidence. The response protests that the article "interprets" the evidence "in the most damaging light for Bryant." [13] at 39. But even if Rosenberg had "erred in interpreting [his] source[s]," that would not show actual malice. *Zerangue*, 814 F.2d at 1070. An "understandable misinterpretation of ambiguous facts" does not establish actual malice. *Walker*, 938 F.3d at 744; *see also Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971) (reasoning that reporter's "deliberate choice of . . . an interpretation, though arguably reflecting a misconception," was "the adoption of one of a number of possible rational interpretations" of source material). For example, when VanLandingham texted Bryant, "I'd like to give you a company package for all your help," [1-3] ¶ 6.250, Rosenberg interpreted the message as an offer of Prevacus stock. *See* [1-2] at 14. While Bryant argues that Rosenberg misstated this text, he also admitted that "[t]he phrase 'company package' is vague, and its meaning is ambiguous," before offering what he believed was the "most reasonable interpretation." [13] at 32 (cleaned up). Rosenberg had a right to interpret the term "company package" to mean stock. *See Walker*, 938 F.3d at 744.

Bryant offers no factual content suggesting that Rosenberg misinterpreted any (much less all) of his evidence with a "high degree of awareness of probable falsity." *Harte-Hanks*, 491 U.S. at 667 (cleaned up); *see also supra* notes 2–3 and accompanying text. Thus, Bryant's no-competent-evidence allegation does not plausibly indicate that Rosenberg had a "high degree of awareness of probable falsity or . . . entertained serious doubts as to the truth of his publication." *Harte-Hanks*, 491 U.S. at 667 (cleaned up).

Individually and cumulatively, Bryant's allegations do not plausibly plead actual malice. The Court cannot reasonably infer that Rosenberg published with "knowledge of falsity or reckless disregard as to truth or falsity." *Masson*, 501 U.S. at 511; *see also Benfer*, 120 F.4th at 1279. The Court thus dismisses Bryant's defamation claim.

### B.  False Light

The Court turns to Bryant's second claim: false light. That claim has two elements: (1) a false claim that would be "highly offensive to a reasonable person" and (2) actual malice. *Cook v. Mardi Gras Casino Corp.*, 697 So. 2d 378, 382 (Miss. 1997). For the same reasons discussed above, Bryant fails to plausibly allege actual malice. So the Court dismisses Bryant's false-light claim.

### C.  Derivative Claims

Since the Court dismisses the defamation and false-light claims, it also dismisses Mrs. Bryant's loss-of-consortium claim, along with the joint respondeat-superior and injunctive claims, as derivative. [1] ¶¶ 9.1–11.3. Under Mississippi

law, loss of consortium and respondeat superior are both derivative claims, and "if the underlying . . . claim is disposed of," neither claim can "be maintained on its own." *J & J Timber Co. v. Broome*, 932 So. 2d 1, 6 (Miss. 2006). Likewise, injunctive claims are derivative because they require plaintiffs to show "a substantial likelihood of success on the merits . . . ." *Tex. Tribune v. Caldwell County*, 121 F.4th 520, 525 (5th Cir. 2024) (cleaned up). Thus, the failure of the defamation and false-light claims dooms the loss-of-consortium, respondeat-superior, and injunctive claims as well.

D.  Leave to Amend

In a footnote in their response memorandum, the Bryants request leave to amend: "If the [C]ourt grants the motion [to dismiss] . . . , it should grant the Bryants leave to amend their complaint to more fully state their claims. They indeed can and will." [13] at 11 n.11 (citing *Rivera-Colon v. Par. of St. Bernard*, 516 F. Supp. 3d 583, 591 (E.D. La. 2021)). The Court may deny leave to amend "for a substantial reason, such as . . . futility." *Porretto v. City of Galveston Park Bd. of Trustees*, 113 F.4th 469, 491 (5th Cir. 2024) (cleaned up). The Bryants' request to amend is "bare bones." *Id.* And a bare bones request "remains futile when it fails to apprise the district court of the facts that the plaintiff would plead in an amended complaint." *Id.* (cleaned up).

Moreover, the allegations in the [1] Complaint do not indicate that the Bryants "might be able to state a claim based on the underlying facts and circumstances" if permitted leave to amend their pleadings. *Ass'n of Am.*

21

*Physicians*, 103 F.4th at 394 (cleaned up). First, the Bryants attached 277 pages of exhibits to their [1] Complaint (and 454 pages of exhibits to their [12] Response), including the contested article. If they have not sufficiently alleged actual malice at this point, there is no sign that they can cure that deficiency if permitted leave to amend. Second, in their response memorandum, the Bryants repeatedly state their belief that the allegations in the [1] Complaint adequately allege actual malice. [13] at 11, 33, 44; *see also Babb v. Dorman*, 33 F.3d 472, 479 (5th Cir. 1994). The Court thus concludes the Bryants have pled their best case on actual malice.

IV.    Conclusion

For the reasons stated above, the Court GRANTS Arena and Rosenberg's [4, 9] Motions to Dismiss and DISMISSES WITH PREJUDICE the Bryants' claims against Arena and Rosenberg. In doing so, the Court has considered all the parties' arguments. Those arguments not addressed would not have altered the Court's decision. The Court will enter a separate final judgment consistent with this Order.

SO ORDERED, this 25th day of March, 2025.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE